331 F.3d 261
 HENRIETTA D., Henrietta S., Simone A., Ezzard S., John R., Pedro R., on behalf of themselves and all others similarly situated, Plaintiffs-Appellees,
v.
Michael R. BLOOMBERG,[1] Mayor of the City of New York, Marva Hammons, Administrator of the New York City Human Resources Administration and Commissioner of the New York City Department of Social Services, and Marva E. Glass, Commissioner of the New York State Department of Social Services, Defendants-Appellants.
 Docket No. 02-7022(L).
 Docket No. 02-7074(CON).
 United States Court of Appeals, Second Circuit.
 Argued: September 26, 2002.
 Decided: June 9, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Susan J. Kohlmann (Karen B. Dine, David Oakland, Carolina A. Fornos, Heather Bridgid Conoboy, on the brief), Pillsbury Winthrop LLP, New York, New York; Victoria Neilson, HIV Law Project, New York, NY; Armen H. Merjian, Jennifer Sinton, Virginia Shubert, Housing Works, Inc., New York, New York, on behalf of Plaintiffs-Appellees.
 Edward F.X. Hart, Assistant Corporation Counsel (Leonard Koerner, Georgia M. Pestana, on the brief), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, on behalf of Defendants-Appellants Rudolph Giuliani and Marva Hammons.
 Vincent Leong, Assistant Attorney General (Michael S. Belohlavek, Deputy Solicitor General, Deon Nossel, Assistant Solicitor General, on the brief), for Eliot Spitzer, Attorney General of the State of New York, New York, New York, on behalf of Defendant-Appellant Marva E. Glass.
 Ralph F. Boyd, Jr., Assistant Attorney General, Jessica Dunsany Silver, Seth M. Galanter, Attorneys, United States Department of Justice, Civil Rights Division, Appellate Section—PHB, Washington, DC, on behalf of Amicus Curiae the United States.
 Before: MESKILL, SACK, and KATZMANN, Circuit Judges.
 KATZMANN, Circuit Judge.
 
 
 1
 The plaintiffs in this civil rights litigation, indigent New York City residents who suffer from AIDS and other HIV-related illnesses, are clients of New York City's Division of AIDS Services and Income Support ("DASIS"), an agency whose sole function is to assist persons with HIV-related diseases in obtaining public assistance benefits and services. The plaintiffs allege that in spite of DASIS's existence (and in part due to DASIS's ineffectiveness), New York City and New York State are failing to provide them with adequate access to public benefits, and are thereby violating various federal and state statutes, regulations, and constitutional provisions.
 
 
 2
 Following a bench trial in the United States District Court for the Eastern District of New York (Johnson, J.), the District Court found in plaintiffs' favor, holding that defendants Rudolph Giuliani, as then-Mayor of New York City, and Marva Hammons, as Administrator of the New York City Human Resources Administration and the Commissioner of the New York City Department of Social Services (together, the "city defendants"), by failing to provide adequate access to public benefits and services, had "violated Title II of the Americans with Disabilities Act of 1990 [(the "ADA")], 42 U.S.C. § 12131 et seq. and its implementing regulations; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and its implementing regulations; 42 U.S.C. §§ 1396(a)(8), (a)(19) [sic],[2] ... 42 C.F.R. §§ 435.911(a) and (b), and 7 C.F.R. § 273.2, and 42 C.F.R. § 206.10(a)(i); "New York State Social Services Law and implementing regulations and administrative directives; the Due Process clause of the New York State and United States Constitutions; and Article XVII, Sections 1 and 3 of the New York State Constitution." Henrietta D. v. Giuliani, 119 F.Supp.2d 181, 220-21 (E.D.N.Y.2000). It also held defendant Marva E. Glass (the "state defendant"), as Commissioner of the New York State Department of Social Services, vicariously liable for violating the same provisions of the ADA and the Rehabilitation Act based on the violations of the city defendants. Id. at 221. The District Court ordered injunctive relief against all defendants. All defendants appeal the District Court's findings of liability against them and the District Court's imposition of injunctive relief. Because we conclude that the alleged general failure of New York City's public benefits system in this case does not excuse the city defendants from their duty under the ADA and the Rehabilitation Act to ensure that the plaintiff class-members have meaningful access to the benefits to which they are facially entitled, we affirm as to those defendants. Additionally, because we agree with the District Court that the state defendant was subject to suit under the ADA, not shielded by sovereign immunity, and possessed of an obligation to supervise the effective delivery of benefits granted as part of New York State's agreement with the United States, we also affirm as to the state defendant.
 
 Background
 
 3
 The certified plaintiff class consists of "[a]ll DAS-eligible[3] persons, i.e., persons who are New York City residents, are Medicaid eligible and meet the medical condition of having either (1) CDC defined AIDS, or (2) an HIV-related condition and a need for home care services." Henrietta D. v. Giuliani, No. 95 Civ. 0641, 1996 WL 633382, at *16 (E.D.N.Y. Oct. 25, 1996). The members of the class assert that they face unique physical hurdles in attempting to access certain public assistance benefits and services. They claim that DASIS, the New York City agency charged with helping them access such benefits and services, is ineffective and systemically fails to achieve its goals. The plaintiffs seek injunctive relief ordering the defendants, various city and state officials charged with implementing New York's social services system, to provide the benefits to which the plaintiff class is entitled.
 
 1. The Social Services Network
 
 4
 Before turning to the plaintiffs' specific complaints, it is necessary briefly to canvass the structure of the New York public benefits system. Congress has authorized the grant of federal money to consenting States in exchange for promises that the States will provide to qualifying individuals certain forms of public assistance, such as food stamps, welfare benefits, and Medicaid coverage. See, e.g., 7 U.S.C. §§ 2011-2036 (food stamps); 42 U.S.C. §§ 601-619 (assistance to needy families); 42 U.S.C. §§ 1396-1396v (Medicaid). Pursuant to such a federal-state cooperative program, New York provides eligible New Yorkers with public financial assistance benefits, see, e.g., N.Y. Soc. Serv. Law §§ 131-a, 157 to 59, 348 to 49, Medicaid benefits, see N.Y. Soc. Serv. Law §§ 363 to 39, and food stamps, see N.Y. Soc. Serv. Law § 95. The New York State Department of Social Services[4] oversees the statewide benefits system, but the programs are administered on a day-to-day basis by 58 local county districts, one of which is New York City. See N.Y. Soc. Serv. Law § 61. "In the administration of public assistance funds, whether they come from Federal, State, or local sources, the authority and responsibility is that of the county commissioners of social services, not the counties; the local commissioners act on behalf of and as agents for the State." Beaudoin v. Toia, 45 N.Y.2d 343, 408 N.Y.S.2d 417, 380 N.E.2d 246, 247 (1978). While the local agencies operate the benefits system, including processing applications for benefits and making eligibility determinations, the state agency is required to "supervise all social services work." N.Y. Soc. Serv. Law § 20(2)(b). The state agency oversees the local districts largely through administration of a "fair hearing" system whereby applicants for, and recipients of, state-provided public benefits may challenge local district decisions before an impartial administrative law judge, and may ultimately seek judicial review. See N.Y. Soc. Serv. Law § 22. Thus, both the city defendants and the state defendant play a role in the administration of New York's social services system, and the nature of the relationship between the state defendant and the city defendants is a key issue that we explore below.
 
 2. DASIS
 
 5
 The City of New York sought in 1997 to assist its HIV-afflicted residents in their efforts to access public services and benefits by combining under one umbrella several city agencies that endeavored to assist that population. See N.Y. City Admin. Code § 21-126 et seq. ("the DASIS law"). The DASIS law aims to "provide access to [publicly subsidized benefits and services] to every person with clinical/symptomatic HIV illness ... or with AIDS." N.Y. City Admin. Code § 21-126. The DASIS law specifically locates DASIS within the New York City Department of Social Services. See id. ("There shall be a division of AIDS services within the New York city department of social services.").
 
 
 6
 The DASIS law imposes procedural rules designed to facilitate access to existing federal, state, and local welfare benefits and also mandates certain benefits that can arguably be characterized as additional substantive benefits. Procedural rules include, for example, an "intensive case management" requirement with specified minimum caseworker-client ratios, see N.Y. City Admin. Code § 21-127, and a requirement that services or benefits be provided within twenty business days of an application where no law or regulation provides a different time frame, see N.Y. City Admin. Code § 21-128(c)(2). Most of the services and benefits to which DASIS helps facilitate access are programs available to non-disabled individuals in addition to the plaintiff class, and the DASIS law makes clear that "[a]ny eligible person shall receive only those benefits and services for which such person qualifies in accordance with the applicable eligibility standards established pursuant to local, state or federal statute, law, regulation or rule." Id. at § 21-128(b). Some of the services to which DASIS is intended to facilitate access, however, are available only to those afflicted with HIV-illness. See, e.g., N.Y. Comp.Codes R. & Regs. tit. 18, § 352.3(k)(1) (providing emergency shelter allowances for the HIV-afflicted population); N.Y. City Admin. Code § 21-128(b) (providing for access to enhanced rental assistance for the HIV-afflicted population and their family members residing with them). Additionally, the DASIS law requires continued provision of "transportation and nutrition allowances" in the same amounts that they had been provided prior to enactment of the DASIS law (although the city council and the mayor retain the power to adjust the amounts in the event of a "material reduction" in the state's "funding allocation"). See N.Y. City Admin. Code § 21-127. As we discuss below, an issue in this litigation is whether the DASIS law represents an attempt to provide the plaintiff class with additional, substantive benefits unavailable to other members of the population (as the defendants contend) or whether (as the plaintiffs contend) the DASIS law aims merely to provide an accommodation to the plaintiff class designed to facilitate meaningful access to benefits available to other similarly situated people.
 
 3. Factual Findings With Respect To DASIS
 
 7
 Against this backdrop, we turn to the District Court's findings with respect to the plaintiffs' allegations that DASIS has failed adequately to provide the services it is supposed to provide. The District Court's extensive and thorough findings of fact are set forth in its reported opinion, Henrietta D., 119 F.Supp.2d at 184-204, and we pause here only to emphasize the key facts relevant to this appeal.
 
 
 8
 As an initial matter, the District Court, after hearing the testimony of several individuals afflicted with HIV-related illness, agreed with the plaintiffs that the physical challenges and medical risks faced by the plaintiff class create unique barriers with respect to obtaining access to public benefits and services:
 
 
 9
 People living with HIV and AIDS develop numerous illnesses and physical conditions not found in the general population, and experience manifestations of common illnesses that are much more aggressive, recurrent, and difficult to treat. Infections and cancers spread rapidly in a person whose immune system has been compromised, and the effectiveness of medicine is diminished by nutritional problems that limit the body's ability to absorb what is ingested. Illnesses that are not lethal to the general population can kill an HIV-infected person. For all these reasons, persons with AIDS and HIV-related disease experience serious functional limitations that make it extremely difficult, if not impossible in some cases, to negotiate the complicated City social service system on their own.
 
 
 10
 * * * * * *
 
 
 11
 The opportunistic infections and chronic conditions that result from a weakened immune system limit the HIV-infected person's ability to engage in regular activities of daily life such as traveling, standing in line, attending scheduled appointments, completing paper work, and otherwise negotiating medical and social service bureaucracies....
 
 
 12
 Functional limitations also develop from the primary drugs used to combat AIDS and HIV-related disease.... An individual receiving this common regime of prescription drugs likely will be restricted in his or her ability to walk, stand, or travel. Other side effects include enhanced neuropathy, diarrhea, nausea, and vomiting.
 
 
 13
 * * * * * *
 
 
 14
 The requirement that persons with AIDS and advanced HIV disease travel to and wait in infection-ridden public waiting rooms can be dangerous, and even life-threatening, for this population, all of whom suffer from severely weakened immune systems.
 
 
 15
 Id. at 185-86 (internal citations and paragraph numbering omitted).
 
 
 16
 The District Court concluded that DASIS was designed to address these obstacles, and most of the testimony at trial dealt with the plaintiffs' allegations that DASIS generally failed to provide the services that it was mandated by law to provide. After hearing testimony from DASIS clients, DASIS employees, advocates for DASIS clients, and experts, the District Court concluded that the allegations were well-founded, finding that DASIS was "chronically and systematically failing to provide plaintiffs with meaningful access to critical subsistence benefits and services, with devastating consequences." Id. at 209.
 
 
 17
 The District Court discussed several different aspects of the evidence in reaching this conclusion. First, it cited the testimony of various plaintiffs who had testified that they frequently had limited contact with DASIS caseworkers and often had received untimely responses or no response to requests made through DASIS. See id. at 186-95. Second, the District Court noted that the testimony of two individuals who had assisted DASIS clients supported the testimony of the DASIS clients that DASIS was disorganized and often unresponsive. Id. at 195-99. For example, the Director of the Legal Advocacy Program of Bronx AIDS Services testified that she had "experienced extensive problems in working with clients trying to access benefits and services through DASIS," and that "(i) there [were] problems reaching case workers, (ii) her clients' public assistance cases ha[d] been improperly terminated without notice or adequate notice, and (iii) she had experience[d] significant problems with regard to relocating clients, including having clients lose apartments or face eviction because of DASIS'[s] failure timely to assist the clients." Id. at 195-96 (internal quotation marks omitted). She further testified that she had encountered "daily problems reaching case managers that include calling but the case manager's phone is off the hook, not having her calls returned or not receiving a response to written correspondence or waiting several hours at a DASIS office to speak to someone concerning one of her clients." Id. at 196.
 
 
 18
 Third, the District Court pointed to a statistical analysis of DASIS's performance in processing thirty-one rental assistance applications, prepared by Dr. Ernest Drucker, a professor of epidemiology and social medicine at Montefiore Medical Center who specializes in examining AIDS and its effects on the New York City population. Id. at 199. The District Court summarized the results of the report:
 
 
 19
 In over 77% of [the cases analyzed], the City failed to meet its own mandated time frames of 20 business days or approximately 30 calendar days. For those applicants who were not acted upon with [sic] the legally mandated time frames, the median length of time was 63 days but the range for applicants was up to 132 calendar days. The considerable delays in the approval of rental assistance shown in this report provide probative evidence of delays that are typical and systemic.
 
 
 20
 Id. at 199-200. The District Court concluded with respect to the Drucker study that "the foregoing facts credibly demonstrate systemic problems in DASIS' efficient and timely administration of benefits." Id. at 203.
 
 
 21
 Fourth, the District Court noted that even a key DASIS official had acknowledged the failure of DASIS to properly monitor its caseload:
 
 
 22
 Deputy Commissioner Caldwell testified that DASIS was not fully in compliance with the legal requirements of the DASIS Law in either December 1997 or in June 1998, and is not today fully compliant with the DASIS Law. Deputy Commissioner Caldwell further admitted that, despite the mandates of the DASIS Law, DASIS does not track the length of time required to process requests for many benefits and services, including those administered by the State; the total number of persons placed in permanent housing; the average length of time to reopen cases closed; or the average length of time required to comply with fair hearing decisions.
 
 
 23
 Id. at 203 (internal citations and paragraph numbering omitted).
 
 4. The District Court Ruling
 
 24
 The District Court held that the plaintiffs had demonstrated that they required special accommodations in order to access public benefits and services, and concluded that the DASIS law, if properly complied with, would provide the necessary accommodations to the HIV-positive population, id. at 208, but that DASIS was not functioning as the DASIS law had intended:
 
 
 25
 At this time, the Court finds that plaintiffs demonstrated at trial that ... DASIS... is broken, i.e., that defendants are failing to make the reasonable accommodations necessary to ensure plaintiffs meaningful access to, and an equal opportunity to benefit from, the social welfare benefits and services that defendants provide to eligible New York City residents. The extensive evidence proffered at trial — from representative plaintiffs, from some of the City's largest providers of services to the plaintiff class, from expert testimony, and from the City's own performance-tracking reports — establishes unequivocally that defendants are chronically and systematically failing to provide plaintiffs with meaningful access to critical subsistence benefits and services, with devastating consequences.
 
 
 26
 Id. at 209.
 
 
 27
 Based on these findings and conclusions, the District Court ruled in the plaintiffs' favor, holding that New York City had failed to provide the plaintiffs with meaningful access to public assistance benefits and services in violation of Title II of the ADA and section 504 of the Rehabilitation Act. Specifically, the District Court found that the DASIS law provided the reasonable accommodations requested by the plaintiffs, and that the City's failure to comply with the DASIS law violated the ADA and the Rehabilitation Act. Id. at 208-09, 214. The District Court also found the state defendant liable for violating the ADA and § 504 based on her failure to supervise New York City in the provision of public benefits and services. Id. at 216-17.[5]
 
 
 28
 At the trial, the District Court had precluded the defendants from introducing evidence designed to demonstrate that the plaintiffs were in fact receiving benefits on terms no worse than other individuals qualified to receive the same public benefits. Specifically, the defendants had hoped to have Patricia Smith, the Executive Deputy Commissioner of the Family Independence Administration of the City Human Resources Administration, testify about the manner in which services are provided to the non-disabled. The District Court explained its preclusion of the evidence in its opinion, holding that "[p]laintiffs have alleged, and demonstrated, that defendants have failed to provide them with the reasonable accommodations required by the federal disability statutes, thus failing to ensure them meaningful access to the benefits to which they are entitled," and that "[a] comparison with the manner in which benefits are administered to the non-disabled is thus not required, for the question of equality of administration is irrelevant to a claim for reasonable accommodations." Id. at 213.
 
 
 29
 In addition to finding the city defendants and the state defendant liable under the ADA and the Rehabilitation Act, the District Court also found the city defendants liable for violations of the Medicaid Act and its implementing regulations, as well as for violations of the New York State Social Services Law and its implementing regulations and administrative directives, based on the city's repeated terminations of welfare benefits without adequate notice and hearing. Id. at 214-16, 219-20. The District Court further held that the city defendants' failure to provide the plaintiff class with adequate access to benefits violated the New York State Constitution's mandate that "[t]he aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions." Id. at 217-19 (quoting N.Y. Const. Art. 17 § 1).
 
 
 30
 The District Court's conclusions of law announced its intention to award the plaintiffs both declaratory and permanent injunctive relief. See id. at 204, 214. It "retain[ed] full jurisdiction over compliance with this judgment," but referred the matter to "the Honorable Cheryl L. Pollak, United States Magistrate Judge to will [sic] monitor compliance with the terms of this order for a period of three years from this date." Id. at 221. It stated that "Magistrate Judge Pollak shall have the power to compel compliance with the requirements of this judgment, and to recommend penalties and sanctions in the event of noncompliance." Id.
 
 
 31
 Prior to finalization of the form of injunction by the Magistrate Judge, the defendants attempted to appeal the District Court's judgment in plaintiffs' favor to this court. However, we dismissed the appeal for lack of jurisdiction, holding that the judgment of the District Court was not final (and thus not yet appealable under 28 U.S.C. § 1291) until the permanent injunction was issued by the District Court. See Henrietta D. v. Giuliani, 246 F.3d 176, 180-81 (2d Cir.2001). We rejected the contention that we had jurisdiction based on 28 U.S.C. § 1292(a)(1)'s exception to 28 U.S.C. § 1291, which permits interlocutory review of the grant of injunctions, holding that the mere fact that the District Court had ordered the fashioning of injunctive relief and compliance with various statutes was not enough to trigger interlocutory review and that jurisdiction in the Second Circuit would lie only once the "plaintiffs are granted at least part of the ultimate, coercive relief they seek." Id. at 182-83.
 
 
 32
 In a decision dated December 11, 2001, the District Court, over several objections by the defendants, accepted and issued an injunctive order prepared by the Magistrate Judge. The injunction provides that
 
 
 33
 [t]he City of New York, through [DASIS]... shall (a) provide access to public benefits and services to every person with clinical symptomatic HIV illness or with AIDS who requests assistance and (b) ensure the provision of public benefits and services to eligible persons with clinical/symptomatic HIV illness or with AIDS, and (c) comply with all legally-mandated time frames for the delivery of benefits and services.
 
 
 34
 In addition, the injunction requires DASIS to provide "intensive case management" and to maintain specified ratios of caseworkers and supervisors to cases at each field office. It also requires DASIS to enact a number of procedural reforms designed to provide clearer recordkeeping, more efficient response to requests, and meaningful and efficient explanation and notice of actions on benefit applications. The order requires the City to "appoint a representative to handle all problems that DASIS clients are experiencing as reported by Plaintiffs' counsel or their representative `Troubleshooter.'" The plaintiffs' counsel and their representatives have the right "to conduct on-site inspections of DASIS centers" to monitor compliance with applicable law. The order also requires that the state defendant "supervise" the city defendants' compliance with the order, and that the state defendant institute a number of procedural reforms with respect to the fair hearing process it oversees.
 
 
 35
 Both the city and state defendants appeal.[6] The city defendants argue that the facts found by the District Court do not establish a violation of the ADA, the Rehabilitation Act, or the Medicaid Act, and argue that because in their view no violation of federal law was demonstrated, the District Court should have declined to exercise pendent jurisdiction over the state law claims. The state defendant notes its agreement with the city defendants that none of the defendants violated the relevant statutes and regulations, but contends that even if the city defendants violated federal law, the District Court erred in imposing liability on the state defendant.
 
 Discussion
 
 36
 We review a district court's bench trial findings of fact for clear error and its conclusions of law de novo. See Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 145 (2d Cir.2003). Factual findings should "not be set aside unless they are without adequate support in the record, are against the clear weight of the evidence, or are the product of an erroneous view of the law." Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 780 (2d Cir.), cert. denied, 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). "We may overturn an order granting a permanent injunction `if the district court relied upon a clearly erroneous finding of fact or incorrectly applied the law.'" Rodriguez v. City of New York, 197 F.3d 611, 614 (2d Cir.1999) (quoting Gen. Media Communications, Inc. v. Cohen, 131 F.3d 273, 278 (2d Cir.1997)), cert. denied, 531 U.S. 864, 121 S.Ct. 156, 148 L.Ed.2d 104 (2000).
 
 I. The ADA and the Rehabilitation Act
 
 37
 A. Whether the Plaintiffs Have Established That They Are Entitled to a Reasonable Accommodation
 
 
 38
 The ADA was enacted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2000). Its first three titles proscribe discrimination against individuals with disabilities in employment and hiring (Title I), access to public services (Title II), and public accommodations (Title III). The plaintiffs in this case rely upon the anti-discrimination provision of Title II, which provides as follows: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (2000).
 
 
 39
 As the District Court correctly noted, "[a]lthough there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities." Henrietta D., 119 F.Supp.2d at 206 (internal quotation omitted). Indeed, unless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically. See Weixel v. Bd. of Educ., 287 F.3d 138, 146 n. 6 (2d Cir.2002); Rodriguez, 197 F.3d at 618 ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem."); Cercpac v. Health & Hosps. Corp., 147 F.3d 165, 167 (2d Cir.1998). None of the distinctions between the two statutes is relevant here. Accordingly, the District Court properly "consider[ed the] ... ADA and Rehab Act claims together," Henrietta D., 119 F.Supp.2d at 206, and we do so as well.
 
 
 40
 In order to establish a violation under the ADA, the plaintiffs must demonstrate that (1) they are "qualified individuals" with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities. See Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir.1998). Additionally, to establish a violation under the Rehabilitation Act, a plaintiff must show that the defendants receive federal funding. Id. The defendants concede that the plaintiffs are qualified individuals with disabilities, that the defendants receive federal funding, and that the city defendants are subject to both the ADA and the Rehabilitation Act. The defendants deny, however, that plaintiffs have proven that they have been discriminated against because of their disability as that concept is defined under the ADA and Rehabilitation Act.
 
 
 41
 The defendants argue that because the plaintiffs have not demonstrated that they are receiving less access than persons without disabilities to the services they seek, they have failed to show that they are "denied the benefits of the services, programs, or activities of a public entity," 42 U.S.C. § 12132, "by reason of [their] disability," id. (emphasis added), rather than as a result of other forces (such as systemic breakdowns within the entire social services system) that affect the non-disabled as well as the plaintiffs. The plaintiffs counter that they have demonstrated the requisite causal relationship based on the District Court's findings that the plaintiff class, because of the disabilities faced by its members, requires special accommodations in order to obtain meaningful access to social service benefits. They argue that they therefore need only show that such accommodations are not adequately being made available, and that they are not required to demonstrate disparate impact. The question, then, is whether a Title II plaintiff, to succeed on a claim alleging failure reasonably to accommodate, must also establish an adverse disparate impact on persons with the plaintiff's kind of disabilities.
 
 1.
 
 42
 We first note that the plaintiffs advance a "reasonable accommodation" claim, 42 U.S.C. § 12112(b)(5)(A); Alexander v. Choate, 469 U.S. 287, 300-01, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), and, contrary to the defendants' characterization, do not expressly rely on a theory of disparate impact. Our threshold question therefore is whether a Title II plaintiff who wishes to proceed on a reasonable accommodation theory must in any event also establish disparate impact. Put another way, we must determine whether the "concept of discrimination" embraced by the ADA demands that plaintiffs identify a "comparison class" of "similarly situated individuals given preferential treatment." Olmstead v. L.C., 527 U.S. 581, 598, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (plurality op.). We follow our fellow circuits, and the suggestions of the Olmstead plurality, in concluding that it does not.
 
 
 43
 Our analysis of the requirements of a reasonable accommodation claim begins with the Supreme Court's opinion in Choate. There, in interpreting the scope of section 504 of the Rehabilitation Act, the Court suggested that the relevant inquiry asks not whether the benefits available to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled. See Choate, 469 U.S. at 301, 105 S.Ct. 712. The Court explained that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers.... [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." Id.
 
 
 44
 The obligation reasonably to accommodate derives from the statute itself. Title I of the ADA states that "the term `discriminate' includes.... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).[7] In interpreting the statutory terms we look to the views of the Justice Department, which was charged by Congress with issuing regulations implementing both the ADA and Section 504. See Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 45 n. 8 (2d Cir.1997); see also Olmstead, 527 U.S. at 598, 119 S.Ct. 2176 (reserving question whether Justice Department regulations are entitled to mandatory deference, but observing they at least "warrant respect").
 
 
 45
 The Justice Department's regulations, as we understand them, do not require a showing of disparate impact in reasonable accommodation cases. The Department's ADA regulations prohibiting "discrimination" provide in relevant part that:
 
 
 46
 A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability —
 
 
 47
 (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
 
 
 48
 (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
 
 
 49
 (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;
 
 
 50
 (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;
 
 
 51
 ...
 
 
 52
 (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.
 
 
 53
 28 C.F.R. § 35.130(b)(1) (2002). The logical import of the regulations is that the Department has concluded that a public entity is not only prohibited from affording to persons with disabilities services that are "not equal to that afforded others," id. § 35.130(b)(1)(ii), or "not as effective in affording equal opportunity," id. § 35.130(b)(1)(iii), but also cannot prevent a qualified individual with a disability from enjoying "any aid, benefit, or service," id. § 35.130(b)(1)(i), regardless of whether other individuals are granted access. Similarly, the Department's regulations implementing the Rehabilitation Act state that "a recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 28 C.F.R. § 41.53 (2002) (emphasis added). This mandatory language necessarily implies that the regulation is not conditioned on the ability of the "otherwise qualified... applicant" to show that other applicants receive more favorable treatment. The defendants have not challenged the validity, nor directly challenged the reasonableness, of either set of regulations.
 
 
 54
 We have employed a similar understanding in our cases applying the Rehabilitation Act. That is, our cases speak simply in terms of helping individuals with disabilities access public benefits to which both they and those without disabilities are legally entitled, and to which they would have difficulty obtaining access due to disabilities; the cases do not invite comparisons to the results obtained by individuals without disabilities. We have specifically embraced the view that the Rehabilitation Act requires affirmative accommodations to ensure that facially neutral rules do not in practice discriminate against individuals with disabilities. See Dopico v. Goldschmidt, 687 F.2d 644, 652 (2d Cir.1982). In language that is much quoted by the District Court and by the parties, we commented that:
 
 
 55
 "denial of access cannot be lessened simply by eliminating discriminatory selection criteria; because the barriers to equal participation are physical rather than abstract, some sort of action must be taken to remove them.... It is not enough to open the door for the handicapped...; a ramp must be built so the door can be reached."
 
 
 56
 Id. (emphasis added and internal quotations and citations omitted). The Dopico court further explained that "where the relief requested did not modify some integral aspect of a defendant's program, courts have ruled that section 504 does require efforts to make the program available to otherwise qualified handicapped persons." Id. at 653 n. 6. Similarly, in Rothschild v. Grottenthaler, we found that a public school had a duty under § 504 of the Rehabilitation Act reasonably to accommodate deaf parents by providing them with a sign language interpreter at "school-initiated conferences incident to the academic and/or disciplinary aspects of their child's education." 907 F.2d 286, 292-93 (2d Cir.1990) (citation omitted). Without the interpreter, deaf parents would not have meaningful access to the service provided to non-deaf parents. We stated that "`Section 504 of the Rehabilitation Act requires some degree of positive effort to expand the availability of federally funded programs to handicapped persons otherwise qualified to benefit from them.'" Id. (quoting Dopico, 687 F.2d at 653 n. 6). In short, our measure in both cases was whether the plaintiffs with disabilities could achieve meaningful access, and not whether the access the plaintiffs had (absent a remedy) was less meaningful than what was enjoyed by others.
 
 
 57
 Other courts have explicitly distinguished claims based on failure reasonably to accommodate from those based on disparate impact. For example, in Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1283 (7th Cir.1996), the Seventh Circuit stated:
 
 
 58
 [T]his is not a disparate treatment claim, but a reasonable accommodation claim, and it must be analyzed differently. [Plaintiff] is not complaining that [defendant] treated him differently and less favorably than other, non-disabled employees. He is not comparing his treatment to that of any other ... employee. His complaint relates solely to [defendant's] failure to reasonably accommodate his disability.
 
 
 59
 See also Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166 (1st Cir.2002) ("In addition to forbidding disparate treatment of those with disabilities, the ADA makes it unlawful for an employer to fail to provide reasonable accommodations."); Bird v. Lewis & Clark Coll., 303 F.3d 1015, 1020 (9th Cir.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 1583, 155 L.Ed.2d 314 (2003); Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 n. 9 (1st Cir.2000) ("[T]he ADA does more than prohibit disparate treatment. It also imposes an affirmative obligation to provide reasonable accommodation to disabled employees."); Dunlap v. Ass'n of Bay Area Gov'ts, 996 F.Supp. 962, 965 (N.D.Cal.1998) ("A disability discrimination claim may be brought either on the theory that defendant failed to make reasonable accommodations or on a more conventional disparate treatment theory, or both. This is because the ADA not only protects against disparate treatment, it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or `reasonable accommodation.'").
 
 
 60
 Our approach also finds support in the Olmstead plurality's opinion. Writing on this point for herself and three other justices, Justice Ginsburg appeared to reject the suggestion that every ADA claim must necessarily include proof of disparate impact:
 
 
 61
 Nor were [the plaintiffs] subjected to discrimination, the State contends, because discrimination necessarily requires uneven treatment of similarly situated individuals, and [plaintiffs] had identified no comparison class, i.e., no similarly situated individuals given preferential treatment. We are satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA.
 
 
 62
 Olmstead, 527 U.S. at 598, 119 S.Ct. 2176 (plurality op.) (internal quotations and citation omitted).
 
 
 63
 We acknowledge, however, that the ADA and Rehabilitation Act are addressed to "rules ... that hurt [people with disabilities] by reason of their handicap, rather than that hurt them solely by virtue of what they have in common with other people." Good Shephard Manor Found., Inc. v. City of Momence, 323 F.3d 557, 561 (7th Cir.2003) (internal quotations and citation omitted). In other words, there must be something different about the way the plaintiff is treated "by reason of ... disability." 42 U.S.C. § 12132. We have long recognized that the basic analytical framework of the ADA includes such a comparative component. See, e.g., Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir.1999) (declining to recognize discrimination where plaintiff requested a substantive benefit that was not provided to the non-disabled); Doe v. Pfrommer, 148 F.3d 73, 83-84 (2d Cir.1998) ("[T]he central purpose of the ADA and § 504 of the Rehabilitation Act is to assure that disabled individuals receive `evenhanded treatment' in relation to the able-bodied.... [W]hat [plaintiff] ultimately seeks to challenge is not illegal discrimination against the disabled, but the substance of services provided to him."); Flight v. Gloeckler, 68 F.3d 61, 63-64 (2d Cir.1995) (per curiam); see also Olmstead, 527 U.S. at 600-01, 119 S.Ct. 2176 (plurality op.) (holding that the "unjustified institutional isolation of persons with disabilities is a form of discrimination," because of, among other factors, the "[d]issimilar treatment" inherent in the fact that institutionalized isolation requires persons with disabilities to "relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice"); id. at 611-13, 119 S.Ct. 2176 (Kennedy, J., concurring) (elaborating on the plurality's notion of "dissimilar treatment").
 
 
 64
 It does not follow, though, from this framework that a plaintiff must also demonstrate disparate impact in all cases. That other applicants fail for other reasons to obtain meaningful access to a public service does not demonstrate that applicants with disabilities were not the objects of dissimilar treatment because of their disabilities, or that they were not "subject to a more onerous condition," Olmstead, 527 U.S. at 612, 119 S.Ct. 2176 (Kennedy, J., concurring), than those who did not have disabilities. Further, the statute itself does not literally require a showing of "discrimination." A plaintiff can prevail either by showing "discrimination" or by showing "deni[al of] the benefits" of public services. 42 U.S.C. § 12132.
 
 
 65
 Therefore, we hold that a claim of discrimination based on a failure reasonably to accommodate is distinct from a claim of discrimination based on disparate impact. Quite simply, the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation.
 
 2.
 
 66
 In addition to arguing that the plaintiffs bear the burden of proving disparate impact in order to show failure reasonably to accommodate, an argument we reject, the defendants contend that they should be permitted to show a lack of disparate impact in order to demonstrate that the plaintiffs have not been denied access because of their disabilities. The parties have identified two possible causes of the plaintiffs' low rate of obtaining benefits. The plaintiffs argue that their disabilities create obstacles to access. The District Court has made specific findings that the plaintiffs' disabilities prevent them from accessing public services insofar as the plaintiffs face challenges that make it impossible for them meaningfully to access services absent accommodation, and has further found that the current accommodative measures are unacceptably ineffective. See Henrietta D. v. Giuliani, 119 F.Supp.2d 181, 185-87, 209 (E.D.N.Y. 2000). The defendants, by contrast, purport to be able to demonstrate that the plaintiffs are no less successful in gaining access to benefits than the non-disabled. Such a showing would suggest an alternative reason for the plaintiffs' low rate of obtaining benefits: systemic problems that create obstacles to access for everyone.
 
 
 67
 Before we can address the causation question, though, we must first resolve what is meant by "meaningful access to the benefit that the grantee offers," Choate, 469 U.S. at 301, 105 S.Ct. 712. The ADA, again, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. If the "benefit" or "service" is defined as whatever the government entity in actuality delivers to all of its applicants, and the fact of the matter is that notwithstanding some abstract statutory mandate it delivers nothing to anyone, then we need never reach the causation question, because there is no exclusion.
 
 
 68
 We think, however, that the two statutes plainly define benefits by reference to a plaintiff's facial legal entitlements. Indeed, although the Choate Court noted that "Section 504 seeks to assure evenhanded treatment," it held that "[t]he Act does not, however, guarantee the handicapped equal results from the provision of state Medicaid, even assuming some measure of equality of health could be constructed." 469 U.S. at 304, 105 S.Ct. 712 (emphasis added). The statute's use of the term "qualified" suggests that we must look not to the administration of the program for which the plaintiff is qualified, but rather its formal legal eligibility requirements. 42 U.S.C. §§ 12131-32. The Justice Department's regulations are consistent with this view. See 28 C.F.R. § 35.104 (2002) (defining "[q]ualified individual with a disability" under ADA as one who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity"); id. § 41.32(b) (defining "[q]ualified handicapped person" for Rehabilitation Act purposes as "a handicapped person who meets the essential eligibility requirements for the receipt of [the federally-funded] services"). Finally, it would impose an enormous evidentiary burden on plaintiffs to have to demonstrate empirically that other facially eligible individuals are in fact receiving the benefits to which they are entitled. In the absence of any language to the contrary, we doubt that Congress intended to compel plaintiffs to carry that burden (at least initially). Cf. Del Vecchio v. Bowers, 296 U.S. 280, 286, 56 S.Ct. 190, 80 L.Ed. 229 (1935) (noting that in workers' compensation cases "the likelihood that testimony as to the cause of death would have been more readily available to the employer than to the claimant, justif[ies] a presumption" in favor of the claimant); Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir.2003) (concluding that Congress intended prisoner's obligation to exhaust prison remedies before filing suit to be an affirmative defense because, among other reasons, prison official defendants have better access to prison records); Charles Alan Wright & Arthur R. Miller, 5 Federal Practice & Procedure § 1271 (2002) (observing that the Federal Rules of Civil Procedure are designed such that a party will not bear the burden of proof on a particular point of law when the evidence needed is not typically within the party's control).
 
 
 69
 Turning to the causation question itself, we think that the differing explanations offered by the parties for the plaintiffs' inability to obtain the benefits to which they are facially entitled are not mutually exclusive. Again, the District Court found, and the defendants do not dispute, that the plaintiffs are sharply limited in their ability to "travel[], stand[] in line, attend[] scheduled appointments, complet[e] paper work, and otherwise negotiat[e] medical and social service bureaucracies." Henrietta D., 119 F.Supp.2d at 185. The District Court also found that the existing DASIS accommodative regime is unacceptably dysfunctional, and fails meaningfully to remedy these problems. Id. at 209. The defendants instead contend, in essence, that their own bureaucracy is so defective that even healthy applicants cannot "negotiate" it, such that there is no disparate impact on the plaintiffs. Even accepting that contention as true, we could still be faced with a situation where either of the two alleged causes of denial of access would independently deny meaningful access even were the other fixed.
 
 
 70
 Traditional concepts of causation suggest that under such circumstances, the existence of the "disability cause" alone is enough to sustain the plaintiffs' claims. An ADA plaintiff must demonstrate that a denial of benefits occurs "by reason of ... disability," 42 U.S.C. § 12132, which essentially means that the plaintiff must prove that the denial is "because of" the disability, Olmstead, 527 U.S. at 601, 119 S.Ct. 2176; id. at 611-12, 119 S.Ct. 2176 (Kennedy, J., concurring). The defendants' contention, rendered in these terms, is that disability was not the cause of the difficulties experienced by the plaintiffs, because the same ultimate difficulty would have resulted in any case. The common law of torts, however, instructs that the existence of additional factors causing an injury does not necessarily negate the fact that the defendant's wrong is also the legal cause of the injury. See Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 15 (2d Cir.2000) ("A proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury.") (citing AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 215 (2d Cir.2000); Fane v. Zimmer, Inc., 927 F.2d 124, 128 (2d Cir.1991); Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983)). In assessing whether one cause among many constitutes proximate cause, courts have engaged in inquiries such as whether a cause is a substantial factor in bringing about the harm, see, e.g., FDIC v. Bierman, 2 F.3d 1424, 1434 (7th Cir.1993); Jefferson Bank v. Progressive Cas. Ins. Co., 965 F.2d 1274, 1284 (3d Cir.1992), or whether the cause is "too remotely or insignificantly related to the" harm to be a legal basis for liability, Port Auth. v. Arcadian Corp., 189 F.3d 305, 317-18 (3d Cir. 1999) (internal quotations and citation omitted).[8]
 
 
 71
 In so interpreting the "by reason of ... disability" requirement, we are mindful of the fact that Title II seeks principally to ensure that disabilities do not prevent access to public services where the disabilities can reasonably be accommodated. It is a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). We are thus reluctant to interpret the "by reason of such disability" language of the ADA and Rehabilitation Act, both remedial statutes, so narrowly that they deprive the plaintiffs of reasonable accommodations to which the plaintiffs clearly would be entitled if the social services system were functioning as intended. See Consol. Rail Corp. v. Darrone, 465 U.S. 624, 634, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984) (recognizing that Rehabilitation Act has "remedial purpose"); Castellano v. City of New York, 142 F.3d 58, 69 (2d Cir.1998) (noting "ADA's broad remedial purpose"); Arnold v. United Parcel Serv., Inc., 136 F.3d 854, 861 (1st Cir.1998) (observing that ADA is a remedial statute and so should be construed broadly); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2d Cir.1994) ("Because the [Rehabilitation] Act is a remedial statute, it and the regulations promulgated under it are to be construed broadly."), cert. denied, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).
 
 
 72
 We therefore hold that the District Court did not clearly err in concluding, in effect, that the plaintiffs' disabilities were a substantial cause of their inability to obtain services, or that that inability was not so remotely or insignificantly related to their disabilities as not to be "by reason" of them. The District Court has identified major failures within the existing accommodative regime. This is not a case where the evidence has demonstrated that the plaintiffs are failing to access their full benefits even with the help of a smoothly functioning DASIS, and that those without disabilities are faring no better. Here, DASIS does not function smoothly, and the plaintiffs are unable meaningfully to access benefits. Under these circumstances, where testimonial evidence has made clear that the offered accommodation is highly ineffectual, it is no defense that others are equally unsuccessful in accessing benefits. Moreover, as we noted earlier, the fact that individuals other than the class members have been unable to obtain benefits does not of itself demonstrate that the plaintiffs do not face conditions that are more onerous for them because of their particular disabilities. The absence of disparate impact would not prove that DASIS is effective enough to provide benefits under a state of affairs where the social services system functioned smoothly. Where the District Court has clearly identified disability-related challenges that make access more difficult for the plaintiff class than for those without disabilities, and has found the accommodative scheme to be "broken," we hold that the plaintiffs have demonstrated that their disabilities are a cause of the denial of access to benefits.
 
 
 73
 Of course, as noted above, there is undoubtedly a comparative element to the reasonable accommodation analysis, and a plaintiff must show that the denial of benefits was "by reason of ... disability." However, we believe that this element is satisfied by the plaintiffs' demonstration (i) that they are facially entitled to public benefits which are also available to similarly situated persons without disabilities, and (ii) that under a state of affairs where the social services system functioned properly, their disabilities would clearly necessitate a reasonable accommodation in order for them meaningfully to access the benefits (which accommodation they are not currently receiving). As we indicate below, our decision does not preclude the use in some cases of the absence of disparate impact as a basis for a defense that an offered accommodation is in fact working.[9]
 
 
 74
 B. Whether the Relief Granted Constitutes a Reasonable Accommodation
 
 
 75
 We now turn to whether the injunctive relief ordered by the District Court constitutes a reasonable accommodation. The injunction at its core orders DASIS to perform its statutory mandate, and imposes some procedural mechanisms designed to effectuate this goal. The plaintiffs' prima facie burden in arguing that the relief they obtained represents a reasonable accommodation is "not a heavy one." Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir.1995). We have explained that "[i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits," and that "[o]nce the plaintiff has done this, she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant." Id.
 
 
 76
 We agree with the District Court that the DASIS law represents an attempt at reasonable accommodation and can properly form a basis for the injunctive relief granted in this case. See Henrietta D. v. Giuliani, No. 95 Civ. 0641, 1996 WL 633382, at *9 (E.D.N.Y. Oct. 25, 1996) ("[I]n its most basic, facilitory efforts, DAS is a necessary modification to, and not a fundamental alteration of, the public assistance services that the City provides to all eligible New Yorkers."). The avowed purpose of the DASIS law is to "provide access to [publicly subsidized benefits and services] ... to every person with clinical/symptomatic HIV illness ... or with AIDS," N.Y. City Admin. Code § 21-126, and the DASIS law makes clear that "[a]ny eligible person shall receive only those benefits and services for which such person qualifies in accordance with the applicable eligibility standards established pursuant to local, state or federal statute, law, regulation or rule," id. at § 21-128(b). We do not intimate that either the mere fact that the DASIS law was enacted or the fact that it was viewed as "access" legislation per se makes it a reasonable accommodation under the relevant federal statutes. We find it to be a prima facie reasonable accommodation because we agree with the District Court that its provisions are consistent with its goal of serving as a reasonable accommodation, and it does not appear to impose costs that obviously outweigh its benefits. As the District Court noted, the vast majority of services created by the DASIS law are fundamentally procedural in nature. The law provides for intensive case management, for low client-caseworker ratios, and for imposition of clear deadlines. We thus share the District Court's view that the plaintiffs have established that requiring DASIS to comply with the DASIS law represents appropriate reasonable accommodation relief.
 
 
 77
 The regulations implementing both the Rehabilitation Act and the ADA give a public entity defendant the opportunity to show that a requested accommodation is unreasonable. The regulations provide that such a defendant need not make the requested accommodation if it "would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7), or "impose an undue hardship on the operation of [the] program," 28 C.F.R. § 41.53. Similarly, in outlining the burdens of proof in a reasonable accommodation claim under Title I of the ADA, we have held that a defendant will not be required to adopt an accommodation if it successfully demonstrates that the proposed accommodation is unreasonable, i.e., that it "would cause it to suffer an undue hardship." Borkowski, 63 F.3d at 138. The Supreme Court in Olmstead noted that:
 
 
 78
 the undue hardship inquiry requires not simply an assessment of the cost of the accommodation in relation to the recipient's overall budget, but a case-by-case analysis weighing factors that include: (1)[t]he overall size of the recipient's program with respect to number of employees, number and type of facilities, and size of budget; (2)[t]he type of the recipient's operation, including the composition and structure of the recipient's workforce; and (3)[t]he nature and cost of the accommodation needed.
 
 
 79
 527 U.S. at 606 n. 16, 119 S.Ct. 2176 (internal citation and quotation marks omitted).
 
 
 80
 The defendants in this case have not, however, alleged that the proposed accommodation would cause them or their programs undue hardship. Perhaps that is because, at least at the time this litigation was before the District Court, in the defendants' estimation, the accommodation provided by the DASIS law was not causing such a hardship. We note that if at any time such hardship arises the defendants would undoubtedly have the ability to return to the District Court to seek a modification of its order to reflect that condition.
 
 
 81
 Instead of challenging the requested accommodations based on the burden of their implementation, the defendants argue that no accommodations are required because the plaintiffs have not demonstrated that they are suffering a negative disparate impact relative to similarly situated persons without disabilities. See Henrietta D., 119 F.Supp.2d at 208 n. 17 ("Defendants provided no evidence that DASIS and its special functions represent[] a fundamental alteration of defendants' service, program, or activity. The reasonableness of the modifications that plaintiffs seek, moreover, is evidenced by the fact that virtually all are modifications that defendants have long purported — but failed — to provide, and that they are now required by local law to provide.").[10] As we have observed, no such demonstration is necessary. Accordingly, we affirm the injunction as a reasonable accommodative measure.
 
 
 82
 We pause, however, to address two additional issues raised by the defendants in other contexts that might provide bases for challenging the scope of the accommodation ordered by the District Court. First, while the defendants frame their disparate treatment argument as an attack on the need for a reasonable accommodation itself, their point also might support an argument that the plaintiffs already are being reasonably accommodated. There would be no need for injunctive relief if the plaintiffs were already being reasonably accommodated. See Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 385 (2d Cir.1996) (affirming dismissal of ADA claim because "the accommodations offered by the [defendant] were plainly reasonable."). The defendants' disparate impact argument suggests that had the defendants been able to prove that the plaintiffs are faring no worse in accessing benefits than the non-disabled, they would have proven that the plaintiffs were already being reasonably accommodated.
 
 
 83
 We reject this argument. A "reasonable accommodation" is one that gives the otherwise qualified plaintiff with disabilities "meaningful access" to the program or services sought. Alexander v. Choate, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). That others cannot avail themselves of the services does not make the minimal access provided to the plaintiff "meaningful." As we have held, meaningful access must be defined with reference to the plaintiff's facial entitlement to benefits. In this case, the District Court made specific findings to the effect that qualified plaintiffs cannot obtain benefits without aid, and that the current accommodative regime is dysfunctional. That is sufficient to justify relief. The mere fact that the plaintiffs, in the current apparently broken overall social services system, might not be doing worse than persons without disabilities, does not render the dysfunctional DASIS "reasonable."
 
 
 84
 Second, the defendants assert that the DASIS law fundamentally represents a grant to the plaintiff class of substantive benefits unavailable to persons without disabilities rather than an attempt to accommodate the plaintiff class's disabilities with respect to public benefits available to all qualifying individuals. While the defendants frame this issue as an attack on the plaintiffs' right to any accommodation, it could merit consideration as a basis for questioning whether the injunctive relief granted is overbroad. Even though the plaintiffs have demonstrated that they are entitled to a reasonable accommodation, an accommodation that served as a grant of special substantive rights would not constitute appropriate relief. See Doe v. Pfrommer, 148 F.3d 73, 84 (2d Cir.1998). The DASIS law nominally provides the plaintiffs with certain additional substantive benefits, such as nutritional supplements and transportation allowances. There is language in the District Court's opinion arguably to suggest that the plaintiffs might be able to state a claim to some of these substantive benefits. See Henrietta D., 119 F.Supp.2d at 212 n. 22 (commenting that even the "nutritional supplements and transportation allowances act as reasonable modifications allowing persons with AIDS and HIV access to their benefits, not as benefits additional to those received by the non-disabled public").
 
 
 85
 In spite of this footnote, we do not construe the injunction of the District Court in fact to order access to any of the additional benefits provided only to the plaintiff class. The overall discussion of the opinion and the language of the injunction make clear that the District Court's holding does not ultimately embrace so broad a theory of accommodation. The District Court recognized that the
 
 
 86
 [p]laintiffs have made no claim under the ADA or the [Rehabilitation] Act for additional or better benefits and services than provided to the non-disabled. To the contrary, plaintiffs' ADA and [Rehabilitation] Act claims seek meaningful access to the very same benefits and services provided to the non-disabled. Plaintiffs seek, and this Court requires, only the modifications — such as intensive case management and low case manager-to-client ratios — required to ensure meaningful access to the same benefits and services.
 
 
 87
 Id. at 212; see also Henrietta D. v. Giuliani, 81 F.Supp.2d 425, 432 (E.D.N.Y.2000) ("Plaintiffs do not challenge the amount or adequacy of the benefits available to them; they seek equal and meaningful access to benefits already available to them."). The injunction itself specifically limits the "benefits and services" to which it orders access to "public assistance, Medicaid, Food Stamps, housing, and other benefits and services available to qualifying members of the general public comparable to public assistance and welfare benefits." (emphasis added).[11] This language restricts the injunctive relief to benefits available to both the plaintiffs and the eligible non-disabled.
 
 
 88
 Thus, while we affirm the injunctive relief ordered, we note that we do not read the injunction to require provision of extra substantive benefits unavailable to the non-disabled — including, without limitation, enhanced rental assistance,[12] nutritional supplements, and transportation allowances — nor do we construe it to permit an action based on procedural ineffectiveness if the ineffectiveness relates solely to provision of such "additional" substantive benefits.
 
 
 89
 Finally, we have some concern about the provision of the injunction that requires the defendants to "comply with all legally-mandated time frames for the delivery of benefits and services." Dec. 11, 2001 Order, at 2-3. The DASIS law requires that "[w]here no statute, law, regulation or rule provides a time period within which a benefit or service shall be provided ... such benefit or service shall be provided no later than twenty business days following submission of all information or documentation required to determine eligibility." N.Y. City Admin. Code § 21-128(c)(2). It is not entirely clear to us that once a plaintiff is accommodated to the point that "all information or documentation required to determine eligibility" has been filed, a further requirement for the agency to act with greater dispatch with respect to that plaintiff than it does with respect to other applicants with other infirmities is an "accommodation" of the plaintiff's disability.[13] The fact that a requirement is in the DASIS law does not alone conclusively determine that it is an accommodation required by federal law. Because the defendants do not challenge the timeliness requirements on this ground, however, we need not and do not decide the issue.
 
 
 90
 These observations aside, we agree, as set forth above, with the District Court that the overwhelming purpose of DASIS is to provide access to public benefits available to all, and that the plaintiffs have demonstrated, and the defendants have not rebutted, evidence that DASIS offers a reasonable accommodation to the challenges faced by the plaintiff class. Indeed, counsel for the city defendants commented in colloquy in the District Court that "DASIS itself is a reasonable modification of the public assistance programs administered by HRA to all non-DASIS clients." We are thus comfortable affirming the injunction.
 
 II. Liability of the State Defendant
 
 91
 The state defendant appeals the District Court's imposition of liability on her, as well as the District Court's imposition of injunctive relief against her. She argues that (i) the District Court erred in finding her vicariously liable for the violations of the city defendants; (ii) even if she is liable, the Eleventh Amendment bars the injunctive relief granted against her; and (iii) Congress did not authorize suits under the ADA and Rehabilitation Act against an individual sued in her official capacity. We disagree.
 
 A. State Defendant Liability
 
 92
 The District Court imposed liability under the ADA and Rehabilitation Act on the state defendant for the failings of the city defendants to make reasonable accommodations. It appeared to base such liability both on the state defendant's failure to supervise properly the city defendants and on an agent-principal theory:
 
 
 93
 As this Court has previously ruled, under New York State law, State defendant has a duty to supervise City defendants in the provision of public benefits and services. Indeed, in the administration of public assistance funds, the local commissioners act on behalf of and as agents for the State. Hence, if City defendants have violated plaintiffs' rights under the federal disability statutes, then State defendant, as City defendants' principal, and as their supervisor, is also liable.
 
 
 94
 Henrietta D., 119 F.Supp.2d at 216 (internal citations and quotations omitted).[14]
 
 
 95
 The state defendant argues that neither the ADA nor the Rehabilitation Act require her to supervise the conduct of subsidiary governmental entities who are more directly delivering social services. In particular, she claims that legislation resting on Congress's power to spend money for the general welfare, see U.S. Const., art. I, § 8, cl. 1, can impose obligations on states only when "Congress speak[s] with a clear voice" so that "the States [may] exercise their choice" to accept or decline funds subject to Congress's conditions "knowingly, cognizant of the consequences of their participation," Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); see also Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 114 (2d Cir.2001) (noting that Pennhurst clear statement rule applies to the interpretation of the Rehabilitation Act). Since the ADA is designed to mirror the remedial scheme of the Rehabilitation Act, any Spending-Clause related restriction on the scope of the Rehabilitation Act will be reflected in the ADA, notwithstanding the fact that the ADA is not itself Spending Clause legislation. See Barnes v. Gorman, 536 U.S. 181, 189 & n. 3, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002).
 
 
 96
 It is true that the Rehabilitation Act on its face does not directly announce that participating states will be subject to supervisory liability. Indeed, the Rehabilitation Act does not directly describe any features of the means by which it is enforced; it does cross-reference, however, the judicially-implied private right of action under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (2000). See 29 U.S.C. § 794a(a)(2); Gorman, 536 U.S. at 185, 122 S.Ct. 2097. Where Congress has explicitly directed the courts to create and administer a private right of action, judicial determination of the rules governing the scope of liability is itself, in effect, a clear statement by Congress. See Musick, Peeler & Garrett v. Employers Ins. of Wausau, 508 U.S. 286, 290-91, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993); id. at 302, 113 S.Ct. 2085 (Thomas, J., dissenting); Northwest Airlines, Inc. v. Transp. Workers Union of Am., 451 U.S. 77, 96 n. 35, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981) (observing that federal courts could properly find right to contribution without express congressional authorization where statute provided "an authorization for judicial development of substantive federal law to govern those cases"). Put another way, a State that accepts funds under the Rehabilitation Act does so with the knowledge that the rules for supervisory liability will be subject to judicial determination.[15]
 
 
 97
 In defining the contours of a judicially-administered right of action, "[o]ur task is... to infer how the [enacting] Congress would have addressed the issue had the... action been included as an express provision." Musick, Peeler, & Garrett, 508 U.S. at 294, 113 S.Ct. 2085. We begin with the observation that Spending Clause legislation is "much in the nature of a contract," and that its "contractual nature has implications for our construction of the scope of available remedies." Gorman, 536 U.S. at 186-87, 122 S.Ct. 2097 (internal quotations omitted). Accordingly, absent other evidence of Congress's intent,[16] our initial presumption is that the rules of liability will follow general rules of contract.
 
 
 98
 The common law of contracts strongly suggests that the state defendant is liable to ensure that localities comply with the Rehabilitation Act in their delivery of federally-funded social services. An "obligor" — that is, one who promises performance in exchange for consideration — "cannot rid itself of a duty merely by making an effective delegation." E. Allan Farnsworth, III Farnsworth on Contracts § 11.10 p. 126 (1998). Thus, once a party has made a promise, it is responsible to the obligee to ensure that performance will be satisfactory, even if the promising party obtains some third party to carry out its promise. See Gymco Constr. Co. v. Architectural Glass & Windows, Inc., 884 F.2d 1362, 1365 (11th Cir.1989); Manhattan Sav. Bank v. United States, 214 Ct.Cl. 599, 557 F.2d 1388, 1391 (1977); Davidson v. Madison Corp., 257 N.Y. 120, 177 N.E. 393, 394 (1931). Here, in accepting federal funds, New York State has promised that its programs will comply with the mandate of the Rehabilitation Act. See 29 U.S.C. § 794; United States Dept. of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 605, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986). Therefore, under our contract analogy, New York State is also liable to guarantee that those it delegates to carry out its programs satisfy the terms of its promised performance, including compliance with the Rehabilitation Act.
 
 
 99
 The Justice Department's interpretation of the Rehabilitation Act strongly supports this view. The regulations define a covered "recipient" to include not only the State, but also any of its "successor[s], assignee[s], or transferee[s]." 28 C.F.R. § 41.3(d) (2002). In explaining its parallel ADA regulation, the Department noted: "All governmental activities of public entities are covered, even if they are carried out by contractors. For example, a State is obligated by title II to ensure that the services, programs, and activities of a State park inn operated under contract by a private entity are in compliance with title II's requirements." 28 C.F.R. pt. 35, App. A, at 517 (2002). Furthermore, as other courts have observed, the fact that the Department in its regulations directs its enforcement efforts at the State agency, and not the State's other agents, see 28 C.F.R. §§ 42.504, 42.530, suggests that the Department believes the State has supervisory responsibilities. See Bonner v. Lewis, 857 F.2d 559, 566 (9th Cir.1988) (citing Patton v. Dumpson, 498 F.Supp. 933, 942 (S.D.N.Y.1980)).
 
 
 100
 Moreover, a presumption that the State is responsible for guaranteeing that local entities delivering services comply with the Rehabilitation Act is consistent with Congress's practice in other Spending Clause legislation. See, e.g., United States v. City of Yonkers, 96 F.3d 600, 620 (2d Cir.1996) ("The [Equal Educational Opportunities Act of 1974] also imposes on states the obligation to enforce the equal-educational-opportunity obligations of local educational agencies."); Koster v. Perales, 903 F.2d 131, 136 (2d Cir.1990) ("The Social Security Act requires a state to supervise any plan which the state establishes under the Aid to Families with Dependent Children program (AFDC)."); Kruelle v. New Castle County Sch. Dist., 642 F.2d 687, 697 (3d Cir.1981) (holding that state department of education is liable for failure of local school district to comply with what is now the Individuals with Disabilities Education Act). A number of non-Second Circuit cases also seem to take the view that the state's assumption of liability under the Food Stamp and Medicaid Acts renders it liable for violations of those acts by local agencies. See Robertson v. Jackson, 972 F.2d 529, 534 (4th Cir.1992) ("A state that chooses to operate its [food stamp] program through local, semi-autonomous social service agencies cannot thereby diminish the obligation to which the state, as a state, has committed itself, namely, compliance with federal requirements governing the provision of the food stamp benefits that are funded by the federal government."); Reynolds v. Giuliani, 118 F.Supp.2d 352, 386 (S.D.N.Y.2000) (quoting Robertson and applying its principle to support supervisory liable under the Medicaid Act); Thomasel v. Perales, 78 N.Y.2d 561, 578 N.Y.S.2d 110, 585 N.E.2d 359, 363 (1991) (imposing attorneys fees award on state agency even though misdeeds occurred at local level because "the AFDC administrative scheme creates an interconnected and inextricable chain of authority, with ultimate power reposed in the [State Department of Social Services ("DSS")]. The State, under Federal and State law, has the duty to supervise AFDC plans and is authorized to sanction local districts for failure to comply with State DSS rules. Local social service commissioners act on behalf of and as agents for the State. Each is a part of and the local arm of the single State administrative agency." (internal quotations and citations omitted));[17] see also Tormos v. Hammons, 259 A.D.2d 434, 687 N.Y.S.2d 336, 337 (1st Dept.1999) ("Under the Federal and State statutory schemes, State social service agencies have complete supervisory authority over the local departments.... [T]he ultimate power and responsibility in this administrative scheme lies with State DSS" (internal citations omitted)).
 
 
 101
 We therefore conclude that Congress's intent would best be effectuated by imposing supervisory liability on the state defendant. We note that the state defendant contends only that she has no obligation to supervise the city. As a result, we need not determine what factual showing would adequately establish an actionable failure to supervise, or whether the District Court clearly erred in finding any such showing was supported by the record below. In addition, because our reasoning depends upon the function of the State in the scheme of the Rehabilitation Act, we have no occasion to decide whether the Rehabilitation Act (and therefore the ADA) imposes similar supervisory duties on state officers sued in their individual capacities, see Grune v. Rodriguez, 176 F.3d 27, 34 (2d Cir.1999) (reserving the question), or other non-state individuals or entities.
 
 
 102
 B. Whether the State Defendant May Be Sued in Her Official Capacity Under the ADA and Rehabilitation Act
 
 
 103
 The state defendant additionally argues that the Eleventh Amendment bars the injunctive relief granted against her by the District Court. The Eleventh Amendment, however, does not preclude suits against state officers in their official capacity for prospective injunctive relief to prevent a continuing violation of federal law. See Ex parte Young, 209 U.S. 123, 155-56, 28 S.Ct. 441, 52 L.Ed. 714 (1908); see also Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). Obviously, Commissioner Glass is not herself the State; she is a state officer sued here in her official capacity. Accordingly, we respectfully cannot accept her argument.
 
 
 104
 We also cannot embrace the state defendant's statutory claim that an individual sued in his or her official capacity under the doctrine of Ex parte Young is not a "public entity" subject to liability under the ADA, 42 U.S.C. § 12132. The real party in interest in an official-capacity suit is the government entity. See Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). As a result, it is irrelevant whether the ADA would impose individual liability on the officer sued; since the suit is in effect against the "public entity," it falls within the express authorization of the ADA. See Bruggeman ex rel. Bruggeman v. Blagojevich, 324 F.3d 906, 912-13 (7th Cir.2003); Carten v. Kent State Univ., 282 F.3d 391, 396-97 (6th Cir.2002) (stating that state officials "are public entities insofar as they represent the state when acting in their official capacity"); Grey v. Wilburn, 270 F.3d 607, 609 (8th Cir.2001); Roe No. 2 v. Ogden, 253 F.3d 1225, 1233 (10th Cir.2001); Randolph v. Rodgers, 253 F.3d 342, 348 (8th Cir.2001); Armstrong v. Wilson, 124 F.3d 1019, 1025-26 (9th Cir.1997), cert. denied, 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998); cf. Koslow v. Pennsylvania, 302 F.3d 161, 178-79 (3d Cir.2002) ("[F]ederal ADA claims for prospective injunctive relief against state officials are authorized by the Ex parte Young doctrine."), cert. denied, ___ U.S. ___, 123 S.Ct. 1353, 155 L.Ed.2d 196 (2003). The sole Court of Appeals decision cited to the contrary by the state defendant, Walker v. Snyder, 213 F.3d 344 (7th Cir.2000), cert. denied, 531 U.S. 1190, 121 S.Ct. 1188, 149 L.Ed.2d 104 (2001), was abrogated by Bruggeman, 324 F.3d at 912.
 
 
 105
 This holding is consistent with our decision in Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98 (2d Cir. 2001). In Garcia, we held that a private suit brought pursuant to Title II of the ADA for money damages can only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability. Id. at 111-12. However, we specifically noted, citing Ex parte Young, that "actions by private individuals for injunctive relief for state violations of Title II have not been foreclosed by today's decision." Id. at 115. We observed that while the Supreme Court, in Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), had held that suits in federal court by state employees to recover money damages against the State under Title I of the ADA are barred by the Eleventh Amendment, the Garrett Court had stated in a footnote that
 
 
 106
 [o]ur holding here that Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under Title I does not mean that persons with disabilities have no federal recourse against discrimination. Title I of the ADA still prescribes standards applicable to the States. Those standards can be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief under Ex parte Young.
 
 
 107
 Garrett, 531 U.S. at 374 n. 9, 121 S.Ct. 955 (emphasis added). This footnote, albeit dicta and although specifically addressing Title I, reflects that the Ex parte Young exception to the Eleventh Amendment bar to suit is viable under the ADA. See Bruggeman, 324 F.3d at 913; Carten, 282 F.3d at 397.
 
 
 108
 One other issue with respect to the Eleventh Amendment bears some discussion. In Seminole Tribe of Florida v. Florida, 517 U.S. 44, 73-75, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Court held that Congress may foreclose private enforcement of federal legislation through suits under Ex parte Young. While the state defendant's brief is not entirely clear on this point, it is possible to construe the state defendant's position, as does the amicus curiae United States, as an argument under Seminole Tribe that Congress only intended States, and not their public officials, to be named as defendants. However, in the absence of express direction from Congress, we will not find that reliance on Ex parte Young has been foreclosed when the alternative scheme for enforcing the pertinent federal provisions is not so "detailed" that we must infer that Congress could not have intended private enforcement. Id. at 74, 116 S.Ct. 1114.
 
 
 109
 In our view, Seminole Tribe does not bar Ex parte Young relief under Title II against a state official in her official capacity. Neither § 504 nor Title II displays any intent by Congress to bar a suit against state officials in their official capacities for injunctive relief, nor does either create a remedial scheme so elaborate that it could be thought to preclude relief under Ex parte Young. See Koslow, 302 F.3d at 179 (citing Gibson v. Ark. Dep't of Corr., 265 F.3d 718, 720-22 (8th Cir.2001)); cf. Verizon Md., Inc. v. Public Serv. Comm. of Md., 535 U.S. 635, 647-48, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (finding Ex parte Young available against state officials under Telecommunications Act of 1996, even though act imposed duties on state commission reviewable in federal courts, because "[t]he mere fact that Congress has authorized federal courts to review whether the Commission's action" complies with federal law does not indicate "whom the suit is to be brought against — the state commission, the individual commissioners, or the carriers benefitting from the state commission's order."). Indeed, the United States correctly points out in its amicus brief that in enacting § 504 and Title II, Congress did not limit the availability of equitable remedies, but rather, expressly incorporated the remedies of Title VI of the Civil Rights Act of 1964, which include a judicially recognized implied private right of action. See 42 U.S.C. § 12133; 29 U.S.C. § 794a; Garcia, 280 F.3d at 110-11.[18] We thus agree with the plaintiffs, the United States, and our fellow Courts of Appeals that there is no basis for holding that the ADA or Rehabilitation Act intended to create the kind of comprehensive enforcement scheme that would preclude prospective injunctive relief against a state official in her official capacity.
 
 
 110
 The state defendant's remaining arguments can be resolved more readily. We first do not accept the state defendant's claim that, to the extent that we have drawn on state law to ascribe liability to the state defendant, we have improperly "grant[ed] injunctive relief against a state official on the basis of state law." Fleet Bank, Nat'l Ass'n v. Burke, 160 F.3d 883, 891 (2d Cir.1998) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)), cert. denied, 527 U.S. 1004, 119 S.Ct. 2340, 144 L.Ed.2d 237 (1999). Pennhurst II does not bar federal relief simply because the determination of federal law also involves some antecedent state-law question, or, a fortiori, merely incorporates state-law principles. Fleet Bank, 160 F.3d at 891 n. 6; Catone v. Spielmann, 149 F.3d 156, 160 n. 1 (2d Cir.1998); Mont v. Heintz, 849 F.2d 704, 709-10 (2d Cir.1988); Geis v. Bd. of Educ. of Parsippany-Troy Hills, 774 F.2d 575, 581 (3d Cir.1985). In the case at hand, the District Court's reference to state law responsibilities served merely to aid resolution of the ultimate question of whether the state defendant is complying with its responsibilities under federal law. Nor does the Tenth Amendment offer any bar to the conditions placed on this grant of federal funds. See South Dakota v. Dole, 483 U.S. 203, 210, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). Finally, we disagree with the state defendant's argument that the plaintiffs lack standing. The plaintiffs have demonstrated that the state defendant had a duty to supervise the city defendants, and therefore have demonstrated that their injuries are fairly traceable to the state defendant.
 
 
 111
 Thus, we do not agree with the state defendant's argument that the Eleventh Amendment required the dismissal of the claims against the state defendant, and we affirm her liability under the ADA and Rehabilitation Act.
 
 III. Appropriateness of the Equitable Relief
 
 112
 The city defendants next argue that the District Court abused its discretion by granting declaratory and injunctive relief, contending that the plaintiffs did not demonstrate the likelihood of any future government action in violation of law or their rights sufficient to warrant such relief. A plaintiff seeking injunctive relief bears the burden of demonstrating it will suffer "real and imminent, not remote, irreparable harm" in the absence of a remedy. Levin v. Harleston, 966 F.2d 85, 90 (2d Cir.1992) (internal quotation omitted). "In general, a district court has broad discretion to enjoin possible future violations of law where past violations have been shown .... Courts are free to assume that past misconduct is highly suggestive of the likelihood of future violations." United States. v. Carson, 52 F.3d 1173, 1183-84 (2d Cir.1995) (internal quotations and citations omitted), cert. denied, 516 U.S. 1122, 116 S.Ct. 934, 133 L.Ed.2d 861 (1996). We will uphold a district court's decision to award injunctive relief unless the court abused its discretion. Fair Housing in Huntington Comm., Inc. v. Town of Huntington, 316 F.3d 357, 364-65 (2d Cir.2003); see Fed.R.Civ.P. 52(a).
 
 
 113
 We believe that the District Court's factual findings provide ample support for its grant of declaratory and injunctive relief. The District Court found a situation where DASIS did not fulfill its legal mandate. While the defendants argue that the witnesses testified about past harms and did not address potential future violations, they ignore the fact that a senior DASIS official acknowledged continued non-compliance with the DASIS law, and the fact that the District Court's statistical analysis relied largely on the most recent DASIS reports. The District Court did not abuse its discretion in concluding that these data supported an inference that there were likely to be violations of a similar nature in the future.
 
 IV. Other Claims
 
 114
 The city defendants also challenge the District Court's decision to exercise pendent jurisdiction over the various state law claims because, they argue, the federal claims were meritless and it was therefore unnecessary for the District Court to entertain the state claims. The city defendants do not address the merits of any of the plaintiffs' state law claims. Because, for the reasons stated above, we believe that the District Court properly ruled in the plaintiffs' favor on the ADA and Rehabilitation Act claims, we hold that it properly exercised pendent jurisdiction over the state claims given that the underlying factual issues were identical, and efficiency was therefore obviously served by simultaneous adjudication of the state law issues. See Promisel v. First Am. Artificial Flowers, Inc., 943 F.2d 251, 254 (2d Cir.1991) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)), cert. denied, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). Because we reject the city defendants' challenge to the District Court's assumption of pendent jurisdiction and because the city defendants do not challenge the state law liability on any other basis, we affirm the District Court's finding of liability against the city defendants on the various state law claims.
 
 
 115
 Finally, because we can affirm the injunction entirely based on the ADA and Rehabilitation Act violations, we need not decide the question of whether a private right of action exists under Medicaid, 42 U.S.C. §§ 1396a(a)(8), a(19), as the plaintiffs alleged.
 
 Conclusion
 
 116
 For the reasons stated above, we hold that: (1) a plaintiff advancing a reasonable accommodation claim under the ADA or Rehabilitation Act need not also show that the challenged program or practice has a disparate impact on persons with disabilities; (2) a plaintiff with disabilities suing under the ADA or Rehabilitation Act may show that he or she has been excluded from or denied the benefits of a public entity's services or programs "by reason of such disability" even if there are other contributory causes for the exclusion or denial, as long as the plaintiff can show that the disability was a substantial cause of the exclusion or denial; (3) injunctive relief to remedy a violation of the ADA or Rehabilitation Act is appropriate if it provides the injured plaintiff with "meaningful access" to the programs or services to which the plaintiff is facially entitled; (4) the injunction in this case did not provide the plaintiffs with substantive benefits above and beyond those facially available to all qualifying individuals; (5) the ADA and the Rehabilitation Act make States liable for the failure of their delegates to comply with the requirements of the Acts; (6) a state official sued in his or her official capacity is a "public entity" subject to liability under the ADA; and (7) in enacting the ADA and Rehabilitation Act, Congress did not intend to foreclose private remedies under the doctrine of Ex parte Young. Therefore, we affirm the District Court decision in its entirety, except that we decline to address the plaintiffs' Medicaid Act claim and instead rest our affirmance of the injunction on the ADA and Rehabilitation Act claims. We also note that, while defendants have not up until this time argued that compliance with the District Court's Order represents an undue hardship, if at any time such hardship arises the defendants would undoubtedly have the ability to return to the District Court to seek a modification of its Order.
 
 
 
 Notes:
 
 
 [1]
 Pursuant to Fed.R.App.P. 43(c)(2), Michael R. Bloomberg has been substituted for the former defendant, Rudolph Giuliani
 
 
 [2]
 Although the District Court states that the violations are of § 1396(a)(8), (19), it is apparent from context that it meant to find the city defendants liable under § 1396a(a)(8), (19)
 
 
 [3]
 DAS was one of two predecessor entities that were merged in 1997 to form DASIS. The definition of DAS-eligible persons reflects the official definition in 1996, when the class was certified. The current definition of DASIS-eligible individuals — "every person with clinical/symptomatic HIV illness, as determined by the New York state department of health AIDS institute, or with AIDS, as defined by the federal centers for disease control and prevention" — is similar. N.Y. City Admin. Code § 21-126
 
 
 [4]
 The New York State Department of Social Services has been reconstituted as the New York State Department of Family AssistanceSee 1997 N.Y. Laws, ch. 436, § 122(a). For ease of discussion, this opinion, like that of the District Court and like the Social Services statute itself, continues to use the names and titles in effect at the beginning of this litigation. It should also be noted that effective January 1, 1996, the New York State Department of Social Services transferred partial control of the Medicaid program to the New York State Department of Health, although it appears that the state defendant continues to oversee fair hearings with respect to Medicaid. See 1996 N.Y. Laws, ch. 474, § 233.
 
 
 [5]
 The District Court had previously dismissed all state law claims against the state defendant on Eleventh Amendment groundsSee Henrietta D. v. Giuliani, 81 F.Supp.2d 425, 431 (E.D.N.Y.2000).
 
 
 [6]
 We note that following the September 26, 2002 oral argument before this court, the parties were directed to a follow-up conference with the staff counsel of the Second Circuit in an effort to determine whether they could resolve their differences. They were unable to reach agreement
 
 
 [7]
 "[T]he definition of `disability' applies to all of the ADA."Felix v. New York City Trans. Auth., 324 F.3d 102, 105-06 (2d Cir.2003) (citing Toyota Motor Manuf., Ky., Inc. v. Williams, 534 U.S. 184, 201, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)). Similarly, "discrimination," 42 U.S.C. § 12131, which is not defined in Title II, may take its meaning from Title I. See Washington v. Ind. High Sch. Athletic Ass'n, 181 F.3d 840, 848 (7th Cir.), cert. denied 528 U.S. 1046, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999); Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 47 (2d Cir.1997).
 
 
 [8]
 We emphasize that we need not, and do not, hold that suits under the ADA and Rehabilitation Act are governed in all of their particulars by the common law of torts, or that plaintiffs must always show proximate cause in order to establish that they have suffered "by reason of" their disability. We simply borrow the concept of multiple causation to interpret this particular aspect of the statutes
 
 
 [9]
 We do, however, find that such a defense would be unsuccessful here (even if the defendants could demonstrate the absence of any disparate impact) where the District Court has clearly found that the accommodative measures are inadequate and ineffective
 
 
 [10]
 The only language in the defendants' briefs that touches upon the reasonableness of the accommodation is a brief comment that the preclusion of Patricia Smith's testimony made it difficult for the District Court to assess the degree to which the requested accommodations required deviation from the ordinary administration of social services. We do not believe that Smith's testimony would have materially affected the analysis of the reasonableness of the accommodation
 
 
 [11]
 We are untroubled by the fact that as a practical matter the reforms in DASIS may serve to enhance access to the additional substantive benefits such as enhanced rent assistance, nutritional benefits, and transportation assistance, or by the fact that a presentation of evidence may involve reference to these benefits (as did the evidence in the District Court here). It is not realistic in practice entirely to bifurcate the different types of services DASIS provides. We simply hold that the District Court did not find any right under the ADA to access the "additional" benefits, and that an evidentiary presentation that would be unpersuasive in the absence of reference to provision of access to additional benefits should not prevail
 
 
 [12]
 The injunction does order access to "housing." We read this provision, however, simply to order access to the housing benefit available to all qualifying persons, and not to the enhanced assistance provided to the plaintiff class. Indeed, the plaintiffs themselves note that they "assert[] no claim with respect to the substance of their rental assistance."
 
 
 [13]
 We note, however, that the plaintiffs' disabilities may limit their ability to follow up on their applications or respond to changes in circumstance. Other applicants may be able to investigate and pursue troublesome delays in ways that speed the ultimate disposition of the application
 
 
 [14]
 We ultimately do not address the principal-agent issue because, for the reasons that follow, we hold that the District Court properly held the state defendant liable on a failure-to-supervise theory
 
 
 [15]
 There are, however, some restrictions on our power to craft common-law rules of liability. At least in "cases defining the scope of conduct for which [federal] funding recipients may be held liable for money damages," it appears that we may presume a state defendant is "on notice" only of "remedies explicitly provided in the relevant legislation" and "those remedies traditionally available in suits for breach of contract."Gorman, 536 U.S. at 186-87, 122 S.Ct. 2097. Because we conclude below that the state defendant would be liable under black-letter contract law, we need not decide to what extent this limitation should apply where no money damages are sought.
 
 
 [16]
 For example, where there is a need for flexible interpretation in the face of changing circumstances,see Bennett v. Ky. Dept. of Educ., 470 U.S. 656, 669, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985), the presumption may be inappropriate.
 
 
 [17]
 A passage in the legislative history of the Food Stamp Act (quoted by several of the above cases) also supports this reasoning:
 In essence, state welfare agencies are responsible for the day-to-day administration of the food stamp program (under Federal Rules) and a substantial portion of their administrative costs. In a number of states, these responsibilities are passed down to local welfare agencies because of the structure of the state's welfare system. The state, however, remains ultimately responsible and is the unit with which the [United States Department of Agriculture] deals.
 H.R.Rep. No. 95-464, at 299 (1977), reprinted in 1977 U.S.C.C.A.N.1971, 2235.
 
 
 [18]
 The United States also observes that the legislative history of Title II supports the argument that Congress intended injunctive relief be available. The legislative history indicates that Congress intended the "full panoply of remedies" to be available, H.R.Rep. No. 485, pt. 2, at 98 (1990),reprinted in 1990 U.S.C.C.A.N. 303, 381; H.R.Rep. No. 485, pt. 3, at 52 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 475, and the House Judiciary Committee Report cited as an example of the remedies available under Title II, the Eight Circuit's decision in Miener v. Missouri, 673 F.2d 969 (8th Cir.1982), which held that an implied private right of action for damages and injunctive relief was available under § 504 where officials were sued in their official capacities, H.R.Rep. No. 485, Pt. 3, at 52 n. 62, reprinted in 1990 U.S.C.C.A.N. at 475 n. 62.