DISABILITY ADVOCATES, INC.
and J.R., Plaintiffs,

v.

James W. McMAHON, Superintendent
New York State Police,
Defendant.

No. 01–CV–1313.

United States District Court,
N.D. New York.

July 31, 2003.

Disability Advocates, Inc. (Timothy Clune, Esq., of Counsel), Albany, NY, for Plaintiffs.

Eliot Spitzer, Attorney General of the State of New York (Jeffrey P. Mans, Esq., Asst. Attorney General, of Counsel), Albany, NY, for Defendant.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiffs Disability Advocates, Inc. and J.R. commenced the instant action asserting violations of the Equal Protection Clause, the Due Process Clause, the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, arising out of the New York State Police's[1] ("police") utilizing an Arrest Report form, performing certain checks of police databases, and sending a "File 13" in connection with detentions pursuant to N.Y. Mental Hyg. Law § 9.41 ("section 9.41"). In short, plaintiffs contend that defendant criminalizes mental hygiene pickups by treating or labeling them as arrests, thereby discriminating against persons with mental disabilities. Defendant moves for summary judgment pursuant to Fed. R.Civ.P. 56. Plaintiffs oppose and cross-move for summary judgment. Defendants oppose plaintiffs' motion. Oral argument was heard on March 28, 2003 in Albany, New York. Decision was reserved.

## II. FACTS

On September 23, 1996, J.R. experienced command hallucinations that caused her to cut open her stomach with a razor. (Pl.'s RSMF at ¶ 25.)[2] The New York State Police responded to J.R.'s home. (Id. at ¶ 23.) The police took J.R. into custody pursuant to N.Y. Mental Hyg. Law § 9.41[3] and transported her to a hospital. (Id. at ¶¶ 27, 28, 30.) Following this incident, the police made a "blotter" entry, sent a File 13 message, and filled out a form entitled "New York State Police Arrest Report." (Id. at ¶ 17; Salvino Aff., Exs. 1, 2.)

The "blotter" is a book at each police station recording all official activities. (Pl.'s RSMF at ¶¶ 7, 16.) A "File 13" is a uniform arrest message sent via the New York Statewide Police Information Network ("NYSPIN"). (Id. at ¶ 8.) The NYSPIN is a basic coordinating communication system established by the State Police for the purpose of the prompt collection and distribution of information. (Id.) A File 13 message records information such as the arrested person's name, date of birth, the location of the arrest, and the classification code of the offense involved. (Id. at ¶ 9.)

---

1. The named defendant is James W. McMahon, Superintendent of the New York State Police.

2. Defendant's N.D.N.Y.L.R. 7.1(a)(3) statement of material facts will be referenced as "Def.'s SMF." Plaintiff's response to Def.'s SMF will be referenced as "Pl.'s RSMF." Unless otherwise noted, Def.'s SMF and Pl.'s RSMF will be cited only for facts for which where there is no dispute.

3. Section 9.41 provides in pertinent part that: Any ... police officer who is a member of the state police ... may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40, or, pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place, in which event, such officer shall immediately notify the director of community services or, if there be none, the health officer of the city or county of such action.

The File 13 is a database used for statistical analysis and arrest report tracking. (*Id.*) It is not and cannot be used in relation to the arrested person's criminal history record. (*Id.*) The File 13 database is not available to organizations other than the State Police. (*Id.*) On its face, the File 13 does not indicate that J.R. was arrested. (Salvino Aff. at Ex. 2.) The File 13 indicates the "charge" as "MHL2475," presumably referring to the Mental Hygiene Law. (*Id.*)

The police wrote on the Arrest Report that "subject despondent over recent divorce and contemplating suicide for several months, subject also being treated for multiple personality disorder, subject did take razor blade and attempt to kill herself by cutting open her stomach." (Salvino Aff. at Ex. 1.) In box 31 of the Arrest Report entitled "Charge," the police typed "mentally ill person." (*Id.*) In box 31A of the Arrest Report entitled "C.C.Code," the police typed "MHL2475." (*Id.*)[4] In box 32, the police noted that J.R. was detained for a violation; not a felony or misdemeanor. (*Id.*) In boxes 33 and 34, the police indicated that J.R. was detained pursuant to N.Y. Mental Hyg. Law § 9.41. (*Id.*) In box 36 of the Arrest Report entitled "Authority for Arrest," the police checked the box "pickup." (*Id.*) In box 40 entitled "disposition," the police checked the box "other," and typed in "Dr. Auberg—Saratoga Hospital." (*Id.*) The Arrest Report further indicated that the police checked the NCIC[5] and DCJS,[6] and advised J.R. of her rights. (*Id.*)[7] The Arrest Report notes that no accusatory instruments were filed and that the police did not take J.R.'s

photograph or fingerprints. (*Id.*) Finally, the Arrest Report stated that the status of the matter was "closed." (*Id.*)

Arrest reports are maintained by the State Police. (Pl.'s RSMF at ¶ 13.) If criminal prosecution ensues, arrest reports may be sent to the district attorney's office. (*Id.* at ¶ 12.) Information from arrest reports is not entered into the NYSPIN. (*Id.* at ¶ 11.) Information from arrest reports is entered into the State Police Management Information Network ("SPMIN"). (*Id.* at ¶ 14.) The SPMIN is a database storing information about State Police activities and is not a part of an individual's criminal history record. (*Id.*) Information from the SPMIN is not available outside the State Police. (*Id.*)

When the police make an arrest for an offense, the officer brings the individual to the police station. (*Id.* at ¶ 2.) If the offense charged is a felony or misdemeanor, the police obtain the person's photograph and fingerprints. (*Id.*) By law, the police also are required to present the individual to the local criminal court or issue an appearance ticket. *See* N.Y.Crim. Pro. Law §§ 140.20 (arrest without warrant); 120.90 (arrest upon warrant). Here, J.R. was taken into custody and taken to a hospital. She was not photographed, she was not fingerprinted, she was not handcuffed, she was not taken to the police station, she was not charged with any crime, she was not brought before a local criminal court, and there were no entries on her criminal record. (*Id.* at ¶¶ 33, 34.)

---

4. There does not appear to be any dispute that "MHL 2475" was the proper classification. (Pl.'s RSMF at ¶ 17.)

5. NCIC stands for National Crime Information Center.

6. DCJS stands for Division of Criminal Justice Services.

7. "[A] check of NCIC and DCJS is used to determine whether the individual in custody is 'wanted for arrest or is missing.'" (Salvino Reply Aff. at ¶. 5.)

In April 2000, J.R. was being considered for appointment to the Board of Visitors of the Capital District Psychiatric Center. (*Id.* at ¶ 35.) The police were asked to conduct a confidential background investigation concerning J.R.'s potential appointment (*Id.* at ¶ 36.) J.R. signed a release authorizing the police to access her mental hygiene records. (*Id.* at ¶¶ 39, 40, 41.) The police ran a background check and determined that J.R. was not a wanted person. (*Id.* at ¶ 44.) The investigation confirmed that J.R. had been arrested on an unrelated matter in April 26, 1983 for unlawfully dealing with a child, she pleaded guilty, she was fined, and she was given an unconditional discharge. (*Id.* at ¶ 45.) The investigation revealed no other criminal record. (*Id.* at ¶ 46.) The September 23, 1996 arrest was not part of J.R.'s criminal history, it was not revealed in the criminal record check, and was not included in her background investigation. (*Id.* at ¶ 47.) Further, plaintiff's September 23, 1996 admission to the hospital was not noted in the investigation concerning her mental health record. (*Id.* at ¶ 48.)

J.R. alleges that she did not know that she had been "arrested" in 1996 until the background check was conducted in 2000, nearly four years after the arrest. (Pl.'s SMF at ¶ 20.)[8] J.R. further alleges that a New York State Trooper told her that she could never run for office or hold a government job because of her mental health arrest. (*Id.* at ¶ 21.) J.R. also claims that when she called the New York State Police to inquire about her mental health arrest, a trooper responded that "[w]ell you know what we tell our children don't you? Don't

do anything you are going to be ashamed of later on." (*Id.* at ¶ 22.)

Plaintiffs commenced the instant action claiming that characterizing a custodial detention pursuant to Mental Hyg. Law § 9.41 as an "arrest" criminalizes mental illness, thus violating the Equal Protection and Due Process rights of mentally disabled individuals, and also violates the ADA and the Rehabilitation Act.

## III. STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hawkins v. Steingut*, 829 F.2d 317, 319 (2d Cir.1987). Nevertheless, "[t]he litigant opposing summary judgment ... 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neigh-*

**8.** The evidence regarding how and when J.R. learned about the arrest is somewhat confusing. In their response to defendant's statement of material facts, plaintiffs admit that the arrest was not revealed in the criminal record check and was not included in her

background investigation. (Def.'s SMF at ¶ 47.) At deposition, however, J.R. contends that she first learned of the arrest as a result of the background investigation. This potentially conflicting evidence is irrelevant to the disposition of the pending motions.

*borhood Corp.,* 613 F.2d 438, 445 (2d Cir. 1980) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)).

## IV. *DISCUSSION*

Plaintiffs' concern is that persons who are picked up pursuant to New York's Mental Hygiene Law are being stigmatized because the incident is listed on an "Arrest Report" and a File 13 is transmitted. Simply stated, plaintiffs complain that persons picked up under the Mental Hygiene Law are being labeled as having been "arrested."

Plaintiffs' counsel indicated that this matter could be resolved simply, amicably, expeditiously, and most economically if defendant merely agreed not to use an "Arrest Form" for Mental Hygiene Law pickups, or changed the title of the form so as to not use the word "arrest." For example, future forms could be called an "Activity Form," "Incident Form," or something similar. Such a change likely would have entailed little effort or expense, would necessitate only changing a label, and would have addressed plaintiffs' sensitivities. At oral argument, defendant's counsel could offer no satisfactory reason why the term "Arrest" must be used. Apparently the word "arrest" is employed because the defendant is empowered to do so regardless of any harm it may inflict upon our mentally impaired citizens.

Also at oral argument the parties were encouraged to settle, and were advised that a decision on the motions would be held to afford time for reasonable minds to agree.

Unfortunately, the parties have not come to terms on the resolution of this matter. Thus, the pending motions for summary judgment must now be addressed.

### A. *Americans With Disabilities Act and Rehabilitation Act Claims*

The ADA and Rehabilitation Act prohibit discrimination on account of disability. In this case, plaintiffs claim violations of Title II of the ADA ("Title II") and section 504 of the Rehabilitation Act. Title II prohibits disability discrimination concerning access to public services. 42 U.S.C. § 12132; *see also Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003).[9] Section 504 prohibits discrimination on account of disability by programs receiving federal financial assistance.[10] *Henrietta D.,* 331 F.3d at 272. Generally speaking, the ADA and the Rehabilitation Act are treated identically. *Id; see also Toyota Motor Manuf., Ky., Inc. v. Williams,* 534 U.S. 184, 192–93, 122 S.Ct. 681, 689, 151 L.Ed.2d 615 (2002). Under the circumstances of this case, none of the subtle distinctions between the statutes are implicated, and thus, the two statutes will be addressed together. *Henrietta D.,* 331 F.3d at 272.

■ To establish a prima facie case of discrimination under either statute, J.R. must demonstrate that: (1) defendant is subject to the ADA or Rehabilitation Act;

---

**9.** Section 12132 provides that, "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

**10.** Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (2000).

(2) that she is a qualified individual with a disability; and (3) she was discriminated against by reason of her disability. *Id.*

There is no dispute that defendant is subject to the ADA and Rehabilitation Act. Assuming, *arguendo,* that J.R. is disabled within the meaning of the ADA and Rehabilitation Act, she must demonstrate that she was discriminated against by reason of her disability. J.R. contends that the police treated her as a criminal solely because she had a mental illness; that is, by using an Arrest Report, reading her rights, checking the NCIC and DCJS, sending a File 13, and otherwise referring to her detention as an "arrest."

Plaintiffs are correct that section 9.41 authorizes police to take individuals into "custody" in certain circumstances, and that section 9.41 does not use the word "arrest." N.Y. Mental Hyg. Law § 9.41 (authorizing the police to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others.") Under New York's Criminal Procedure Law, by contrast, the police are empowered to "arrest a person" for "offenses" and "crimes." N.Y.Crim. Proc. Law § 140.10.[11] Plaintiffs, therefore, argue that taking a person into custody pursuant to the Mental Hygiene Law is different than an arrest.

█ The problem with plaintiffs' contention is that while section 9.41 may not use the term "arrest," the authority it grants to the police is, in fact, the legal authority to arrest. As used in the law, the word "arrest" is defined as "to seize (a person) by legal authority or warrant; take into custody." The Random House Dict. of the English Language 83 (1979); Oxford English Dictionary Online (definition of "arrest") ("To capture, seize, lay hold upon, or apprehend by legal authority."); Black's Law Dictionary (7th ed. 1999) ("A seizure or forcible restraint."); Black's Law Dictionary 109 (6th ed. 1990) ("To deprive a person of his liberty by legal authority."); *People v. Gilmore,* 76 A.D.2d 548, 552–53, 430 N.Y.S.2d 854 (2d Dep't 1980); 5 Am. Jur.2d Arrest § 2 (2003).[12] This is exactly what section 9.41 does—it authorizes the police to take a person into custody by legal authority. The term "arrest" is not limited to use in criminal law. *See, e.g.,* Black's Law Dictionary (7th ed.) ("arrest in execution," "arrest in quarters," "arrest on final process," "arrest on mesne process," "civil arrest."); Black's Law Dictionary 110 (6th ed.) ("Arrest of inquest," "Arrest of judgment"); *United States v. Garcia–Martinez,* 254 F.3d 16 (1st Cir. 2001) (discussing "civil arrest"). There are numerous instances where New York law gives police the authority to take a person into custody outside of the criminal context. *See, e.g.,* N.Y. Family Court Act § 718 (authority to detain runaways); N.Y. Mental Hygiene Law § 9.41 (mentally ill persons); N.Y. Mental Hygiene Law §§ 9.27(similar); 9.37 (similar); N.Y. Family Court Act § 724 (authority to detain

---

**11.** The term "offense" is statutorily defined to mean "conduct for which a sentence to a term of imprisonment or to a fine is provided by any law of this state or by any law, local law or ordinance of a political subdivision of this state, or by any order, rule or regulation of any governmental instrumentality authorized by law to adopt the same." N.Y. Penal Law § 10.00(1). The term "crime" is defined as "a misdemeanor or felony." N.Y. Penal Law § 10.00(5).

**12.** The term also means "to stop," such as in the phrase "cardiac arrest" or "arrest of judgment." Oxford English Dictionary Online; Blacks Law Dictionary 110 (6th ed.). In fact, the word is derived from the Old French verb "arrester," which means "to stay, stop." *See* Oxford English Dictionary Online; http://www.etymonline.com/a5etym.htm.

persons in need of supervision); N.Y. Family Court Act § 1024 (authority to take into custody children in imminent danger); N.Y. Soc. Servs. Law § 417 (similar). Thus, plaintiffs' action is premised upon a misunderstanding of the word "arrest." Although there are some negative connotations in the use of the word "arrest," it is not improper for defendant to use a word, or a document that uses a word, that accurately describes their actions when they take an individual into custody pursuant to section 9.41.

There also is no basis for plaintiffs' contention that defendant treats mental hygiene pickups as criminal matters. First, by its plain terms, New York's Criminal Procedure Law is inapplicable to custodial detentions under the Mental Hygiene Law. *See* N.Y.Crim. Proc. Law § 1.10 (providing that the Criminal Procedure Law applies only to criminal actions and proceedings). Neither party contends that pickups under the Mental Hygiene Law are criminal proceedings. Indeed, the courts have noted that "conduct equivalent to mental illness which can result in custody under the Mental Hygiene Law cannot be considered an 'offense'." *People v. Crank,* 155 Misc.2d 762, 766, 590 N.Y.S.2d 149 (1992); *see also* N.Y. Penal Law § 10.00(1).[13]

Second, the procedures employed by the police for Mental Hygiene pickups are significantly different that those employed in criminal matters. In New York, when the police make an arrest for certain specified "offenses," they are required by law to take the arrested person's fingerprints. *See* N.Y.Crim. Proc. Law §§ 140.20; 160.10.[14] Under the circumstances described in Crim. Proc. Law § 160.10, the police also are authorized to take the arrested person's photograph and palmprints. *Id.* Upon making a warrantless arrest for an "offense," the police also are required to either bring the arrested person before a local criminal court or issue an appearance ticket. N.Y.Crim. Proc. Law § 140.20. By contrast, persons detained under the Mental Hygiene Law are to be taken to a hospital or psychiatric emergency program, rather than the police station, N.Y. Mental Hygiene Law § 9.41; they are not photographed; they are not fingerprinted; there is no check of the person's criminal record; and provided there is no concomitant criminal activity, no criminal charges are filed; and they are not brought before a criminal court or issued an appearance ticket. (Salvino Reply Aff. at ¶ 5.) Given the different procedures followed by the police, there is no basis for plaintiffs' contention that pickups under the mental hygiene law are treated as criminal matters or that J.R. was treated as a criminal.

■ While the police ran a check of NCIC and DCJS to determine whether J.R. was wanted or missing, the evidence demonstrates that the police run an NCIC and DCJS check any time they take an

---

**13.** Section 9.41 does not authorize any sentence of a term of imprisonment or fine and, therefore, does not define an "offense."

**14.** The offenses specified in section 160.10 are: (1) any felony; (2) any misdemeanor defined in the penal law; (3) any misdemeanor defined outside the penal law that would constitute a felony if such person had a previous judgment of conviction for a crime; (4) loitering as defined by N.Y. Penal Law § 240.35(3); (5) loitering for the purpose of engaging in prostitution as defined by N.Y. Penal Law § 240.37(2). Section 160.10 also authorizes police officers to fingerprint an arrested person if: (1) the person was arrested for an offense; and (2) the police (i) are unable to ascertain the person's identity; (ii) reasonably suspect that the identification given by the arrested person is inaccurate; or (iii) reasonably suspect the arrested person is being sought by law enforcement officials for the commission of some other offense.

individual into custody. (Clune Aff., Ex. A at 23.) This includes criminal matters, Mental Hygiene pickups, and pickups of runaways. (Salvino Reply Aff. at ¶ 5.) Because the police run NCIC and DCJS in other non-criminal arrests involving non-disabled individuals, it cannot be said that the police discriminated against J.R. on account of her disability. The police also admit using Arrest Forms for persons detained under the Mental Hygiene Law. As previously discussed, there is nothing improper about using a form entitled "Arrest Form," because persons detained under the Mental Hygiene Law are arrested. In any event, plaintiffs fail to substantiate how the use of that form is discriminatory. Rather, the undisputed evidence in the record is that the Arrest Form is used for criminal arrests, arrests of the mentally ill under the Mental Hygiene Law, and arrests of the non-mentally ill, such as runaways. (Salvino Reply Aff. at Ex. A.) Similarly, the police use Arrest Forms for all Mental Hygiene pickups; not just pickups of persons who may qualify as disabled under the ADA. Thus, there is no evidence of discrimination.

■ Plaintiffs also contend that, by reading J.R. her *Miranda* rights, they treated her as a criminal on account of her disability. This argument, too, is misguided. Plaintiffs proffer no evidence that the police advised J.R. of her *Miranda* rights by reason of her disability. The evidence in the record demonstrates that police policy does not require advising individuals of their *Miranda* rights when they are taken into custody under section 9.41. (*Id.* at ¶ 4.) Rather, it seems the more likely case that the police advised J.R. of her *Miranda* rights because she was in their custody. Unquestionably, the *Miranda* warnings are most frequently associated with criminal matters. The holding in *Miranda*, however, is that

the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *Miranda* Court did not refer to "arrests," but described all situations in which a person has been taken into custody or otherwise deprived of her freedom of action in any significant way. *Miranda* is broad enough to include detentions under the Mental Hygiene Law. The reading of *Miranda* warnings does not convert a civil custodial situation into a criminal matter, but merely apprises the individual in custody of her rights with respect to any interrogation by the police. Nothing about the reading of *Miranda* warnings is suggestive of unlawful disability-based discrimination.

■ J.R. next argues that she was discriminated against because, by being arrested, she has been stigmatized by reason of her disability. Assuming there is a stigma associated with arrests, there is no evidence that any such stigma was caused by discrimination on account of her disability. Stated otherwise, there is no evidence that the police acted because of their stereotypes of persons with disabilities. To the contrary, it is undisputed that the police acted because J.R. appeared to be mentally ill and was acting in a manner that was likely to result in serious harm to herself or others. Thus, any stigma associated with the arrest was not the product of disability discrimination, but the police's

response to J.R.'s conduct. Accordingly, there is no basis upon which it may reasonably be concluded that the police discriminated against J.R. on account of her disability.

For the foregoing reasons, plaintiffs' ADA and Rehabilitation Act claims must be dismissed.

### B. *Equal Protection Clause*

Plaintiffs next contend that their Equal Protection clause rights have been violated because "[t]here is no rational basis for the state police to characterize the taking of JR into custody under section 9.41 of the Mental Hygiene Law as an arrest." (Pl.'s Mem. of Law at 14.) "J.R. is challenging the official characterization by the state police that she was subjected to an arrest of any kind pursuant to the Mental Hygiene Law." (*Id.* at 15.) Because, as discussed, a custodial detention pursuant to the Mental Hygiene Law is, in fact, an arrest, the characterization of a Mental Hygiene Law pickup as an arrest is rational.

### C. *Due Process*

#### 1. *Substantive Due Process*

█ J.R. contends that defendant's conduct in "arresting" her was arbitrary, conscience-shocking and oppressive and, therefore, violated her substantive due process rights. There is no such protected interest under the due process clause. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notions of 'substantive due process,' must be the guide for analyzing those claims.'" *Albright v. Oli-*

ver, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "The Framers [of the Bill of Rights] considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." *Albright,* 510 U.S. at 274, 114 S.Ct. 807. Like the term "arrest," the Fourth Amendment is not limited to criminal matters. *See, e.g., Krimstock v. Kelly,* 306 F.3d 40, 49 (2d Cir.2002) (holding that probable cause is necessary for civil forfeitures), *cert. denied,* —— U.S. ——, 123 S.Ct. 2640, 156 L.Ed.2d 675 (2003); *Kerman v. City of New York,* 261 F.3d 229, 234–38 (2d Cir.2001) (applying Fourth Amendment principles to police entry and detention under the Mental Hygiene Law); *Kia P. v. McIntyre,* 235 F.3d 749, 762 (2d Cir.2000) ("We have observed that the Fourth Amendment applies in the context of the seizure of a child by a government-agency official during a civil child-abuse or maltreatment investigation."), *cert. denied,* 534 U.S. 820, 122 S.Ct. 51, 151 L.Ed.2d 21 (2001). Plaintiffs do not claim that the police did not have probable cause to take J.R. into custody.[15] Accordingly, there is no Fourth Amendment or substantive due process violation.

Plaintiffs' argument that defendant's conduct was oppressive and conscience-shocking is defeated by their admission that "the state has a legitimate interest ... as articulated in section 9.41, of providing care to its citizens who are unable because of their mental illness to care for themselves." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 2.) What the police did here was to take J.R. into custody because she appeared to be mentally ill and was acting in a manner likely to cause

---

**15.** Based on the facts presented, the police unquestionably had probable cause to detain J.R. under section 9.41.

harm to herself or others. As noted, when the police did this, they arrested J.R. Nothing about this incident, or labeling it as an arrest, rises to the level of arbitrary, oppressive and conscience shocking governmental abuse. *See, e.g., Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 172–73 (2d Cir.2002) (teacher's actions in slapping a student without any pedagogical or disciplinary justification did not shock the conscience and did not violate student's substantive due process rights); *Robertson v. Arlington Cent. Sch. Dist.*, 229 F.3d 1136, 2000 WL 1370273 (2d Cir. 2000) (table) (no substantive due process violations where child was harmed by a third person in school); *Star v. Burlington Police Dep't*, 189 F.3d 462, 1999 WL 710235 (2d Cir.1999) (table) (plaintiff's allegation that police department's failure to respond to complaints allowed third party to cause her harm did not state valid due process claim); *Skibinski v. Lazaroff*, 173 F.3d 846, 1999 WL 220149 (2d Cir.1999) (table) (government official's failure to act upon complaints is not cognizable under section 1983), *cert. denied*, 528 U.S. 867, 120 S.Ct. 165, 145 L.Ed.2d 140 (1999), *reh'g denied*, 528 U.S. 1183, 120 S.Ct. 1226, 145 L.Ed.2d 1125 (2000); *Natale v. Town of Ridgefield*, 170 F.3d 258 (2d Cir.1999); *Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818 (2d Cir.1996), *cert. denied*, 520 U.S. 1239, 117 S.Ct. 1843, 137 L.Ed.2d 1047 (1997); *Brooks v. Giuliani*, 84 F.3d 1454 (2d Cir.1996), *amended by*, No. 95–9178 (2d Cir. Aug. 7, 1996); *cf. Poe v. Leonard*, 282 F.3d 123, 139 (2d Cir.2002) (state trooper's conduct in surreptitiously videotaping a female while she undressed "qualifies as conduct intended to injure in some way unjustifiable by any governmental interest which rises to the conscience-shocking level.") (internal quotations and citation omitted); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir.2001) (holding that a gym teacher's violent physical assault of a student was sufficiently conscience-shocking to constitute a violation of the student's substantive due process right to be free of excessive force).

### 2. *Procedural Due Process*

■ Plaintiffs next contend that J.R. "possessed a liberty interest of not being arrested without due process of law." (Pl.'s Mem. of Law at 15.) This essentially is a re-characterization of the substantive due process claim and, for similar reasons, must be dismissed. *See also Mawhirt v. Ahmed*, 86 F.Supp.2d 81, 88 (E.D.N.Y. 2000), *aff'd in part and vacated on other grounds*, 8 Fed.Appx. 125, 127, 2001 WL 533595, at * 1 (2d Cir.2001) ("The officers also did not violate [the plaintiff's] procedural due process rights when they transported him to [the hospital] . . . because he was not entitled to a hearing before being taken to a hospital or psychiatric emergency program. *See* N.Y. Mental Hyg. Law § 9.41 (McKinney 1999)."), *cert. denied*, 534 U.S. 1080, 122 S.Ct. 810, 151 L.Ed.2d 695 (2002).

■ To the extent plaintiffs claim the government deprived J.R. of her interest in her reputation without due process of law, this argument too must fail. To state a cause of action for a violation of the Due Process Clause based on governmental stigma, plaintiffs must satisfy the "stigma plus" test, that is: (1) a false statement sufficiently injurious to her reputation, (2) coupled with a deprivation of a legal right. *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir.2002); *Vega v. Miller*, 273 F.3d 460, 470 (2d Cir.2001). This claim must fail for the simple reason that defendant did not make a false statement injurious to her reputation. Plaintiff was arrested.

### V. *CONCLUSION*

A custodial detainment pursuant to N.Y. Mental Hygiene Law § 9.41 is the func-

tional equivalent of an arrest. It, therefore, is not improper, false, or irrational to label such a detainment as an arrest. Plaintiffs have failed to proffer sufficient evidence from which a fair-minded trier of fact reasonably could conclude that defendant treats pickups pursuant to N.Y. Mental Hygiene Law § 9.41 as criminal matters or otherwise treated J.R. differently on account of her alleged disability. Defendant had ample basis to detain J.R. pursuant to section 9.41.

Accordingly, it is hereby

ORDERED that:

1. Plaintiffs' motion for summary judgment is DENIED;

2. Defendant's motion for summary judgment is GRANTED; and

3. The complaint is DISMISSED.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.