Daniel BUCHANAN, as Personal Representative of the ESTATE OF Michael BUCHANAN, et al., Plaintiffs,

v.

State of MAINE, et al. Defendants.

No. CIV.04–26–B–W.

United States District Court, D. Maine.

March 3, 2005.

---

Robert J. Stolt, Lipman, Katz & McKee, Augusta, ME, for Plaintiffs.

Christopher C. Taub, Maine Attorney General's Office, Augusta, ME, Peter T. Marchesi, Wheeler & Arey, P.A., Waterville, ME, for Defendants.

**ORDER AFFIRMING IN PART AND REJECTING IN PART THE RECOMMENDED DECISIONS OF THE MAGISTRATE JUDGE AND GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT**

WOODCOCK, District Judge.

On February 25, 2002, Deputy Kenneth Hatch shot and killed Michael Buchanan.

This law suit tests the legal implications of the circumstances of Mr. Buchanan's death. Concluding that the Plaintiff has stated a cause of action under the public accommodation provisions of Title II of the Americans with Disabilities Act, this Court REJECTS the recommendation of the Magistrate Judge to dismiss Count VII and GRANTS the Plaintiff's Motion for Leave to Amend the Complaint. This Court otherwise AFFIRMS the Magistrate Judge's Recommended Decisions, including its conclusion that the Plaintiff sufficiently stated an equal protection claim against the State Defendants under 42 U.S.C § 1983 to withstand the Motion to Dismiss.

## I. STATEMENT OF FACTS

### A. Michael Buchanan and the AMHI Consent Decree.

Michael Buchanan suffered from bipolar disorder (schizophrenia) with psychosis.[1] Living alone in Somerville, Lincoln County, Maine, Mr. Buchanan was a person with disabilities, unable to work or live in the community setting without mental health services. He received Social Security Income (SSI) as his principal means of sustenance and support.

In 1989, a class of Augusta Mental Heath Institute (AMHI) patients, including Michael Buchanan, initiated a civil rights action in Maine Superior Court against the State of Maine.[2] This class action resulted in a 1990 Consent Decree, which entitled Mr. Buchanan to: 1) adequate professional medical care and treatment; 2) individualized treatment and service plans; 3) freedom from unnecessary seclusion and restraint; 4) provision of treatment and related services in the least restrictive appropriate setting; 5) adequate community support services systems and program(s); 6) freedom from intimidation or cruel punishment resulting in physical harm, pain, mental anguish or death; 7) an individualized support plan; 8) the right to psychiatric treatment; and, 9) crisis intervention and resolution services. The AMHI Consent Decree required the State to provide sufficient crisis intervention services to meet the individual class member's needs.

### B. Michael Buchanan and the Maine Department of Behavioral and Developmental Services.

The Maine Department of Behavioral and Developmental Services (BDS) was the agency within state government charged with providing mental health services to Michael Buchanan. The law suit names as defendants four individuals within the Department: Lynn Duby, former BDS Commissioner; John Nicholas, current Department of Health and Human Services[3] (DHHS) Commissioner; Julianne Edmonson, an Intensive Case Manager Supervisor; and, Joel Gilbert, Mr. Buchanan's Intensive Case Manager. Ms. Edmonson was Mr. Gilbert's direct supervisor.

The law suit charges that the Department was required to and did prepare an Individual Service Plan (ISP), which was supposed to be detailed and tailored to Mr. Buchanan's needs and goals. It alleges

---

1. The facts are taken from the allegations in the Plaintiff's First Amended Complaint.

2. The class action is styled, *Bates v. Grover*, KENSC–CV–89–88 (Me.Super.Ct., Ken.Cty). It remains pending.

3. The Maine Department of Behavioral and Developmental Services is now consolidated with the Maine Department of Human Services and operates under the name, Maine Department of Health and Human Services (DHHS), an executive branch agency of the State of Maine.

the ISP for Michael Buchanan was minimal and superficial. The most important aspect of the ISP was the requirement that he receive a check-up once per week.

Beginning in early 2001, Mr. Buchanan began to deteriorate. He announced he would no longer take his medication and he began to decompensate. By May 2001, he began talking about large snakes living in the culverts and burrowing in the sand near his house. He became angry, describing Nazis, creatures in the woods, his foreign bank accounts, beating a giant snake to death with a $2 \times 4$, and giant crocodiles climbing onto his roof to eat the snake and then, themselves being consumed by giant lizards. He began to talk in threatening tones about not wanting people to come on his property and about shooting them if they did.

Joel Gilbert, the case manager assigned to Mr. Buchanan, began to decrease his visits to Mr. Buchanan. By November 2001, his weekly visits had stretched out to nine to ten days and then to two weeks. No visits occurred in January and February 2002. Instead, Mr. Gilbert began to rely on the observations of a neighbor, Terry Johnston, to report Mr. Buchanan's status. Despite reports of continuing decompensation, no one at the Department intervened. The crisis intervention program the Consent Decree mandated was not invoked. The Complaint alleges that instead, and because of his disability, the State withdrew and withheld mental health services from Mr. Buchanan.

## C. February 25, 2002.

### 1. The Neighbor's Complaint.

At about 4:35 p.m. on February 25, 2002, Mr. Gilbert received a call from Mr. Buchanan's neighbor, Terry Johnston. She reported disturbing activity. Mr. Buchanan had growled and glared at her that morning and had attempted to set her

wood pile on fire. Mr. Gilbert told her to call the police, saying "this was dangerous criminal activity." Mr. Gilbert discussed Mr. Buchanan's case with his supervisor, Ms. Edmonson. She affirmed his decision to take no immediate action and to wait until the next day to contact the Sheriff's Department and find out what had happened. They failed to engage crisis intervention, to go to Mr. Buchanan's home, or to directly alert the Sheriff about Mr. Buchanan's condition.

### 2. The Sheriff is Called.

In accordance with Mr. Gilbert's instructions, Ms. Johnston called the Lincoln County Sheriff's Department and told them about Mr. Buchanan's mental health problems and the "fire." She said she did not want Mr. Buchanan charged, but she did want them to check on him.

The duty to respond fell to Deputy Sheriff Kenneth Hatch. He received the assignment while talking with Deputies Robert Emerson, and Roland Rollins. Neither Deputy Hatch nor Deputy Emerson had any prior knowledge of or dealings with Mr. Buchanan. However, Deputy Rollins had visited Mr. Buchanan with Joel Gilbert during the summer of 2001 and he warned Deputy Hatch not to go alone. Deputy Rollins said Mr. Buchanan "might be violent and definitely had mental health problems." The law enforcement officers did not contact Mr. Gilbert and made no other effort to involve the Department of Behavioral and Mental Health Services. Deputy Hatch asked Deputy Emerson to back him up and they proceeded to Mr. Buchanan's house.

### 3. The Sheriffs Arrive.

At approximately 5:59 p.m., Deputy Emerson radioed dispatch that they had arrived at the entrance of Mr. Buchanan's

unplowed driveway on Valley Road in Somerville and they were about to walk the half-mile to three-quarters-mile trek to his house. When they arrived at the house at about 6:20 p.m., they found Mr. Buchanan barricaded inside, refusing to answer the door. Deputy Hatch radioed dispatch to call Ms. Johnston, find out the name of Mr. Buchanan's counselor, and to contact the counselor and obtain his advice.

When the deputies arrived, Mr. Buchanan was inside his home eating dinner. He first appeared in the window of the kitchen, located on the second floor above the entrance. He appeared to be screaming, but the deputies could not hear his voice. Mr. Buchanan proceeded to another window, which he opened. He screamed at Deputy Emerson, closed the window, and disappeared. He returned, reopened the window, talked to Deputy Emerson, and threw some liquid, perhaps alcohol, at Deputy Emerson. While this was taking place, Deputy Hatch checked the house for entrances and exits and for the source of some smoke; Deputy Hatch concluded the only entrance was through the basement. Mr. Buchanan shut the window, turned off the interior light, and left the kitchen. He proceeded to the other end of the house and turned on a light. Deputy Emerson, following him from outside, heard a loud noise that sounded to him like a gun shot.

#### 4. Mr. Buchanan Appears and Retreats.

Shining his flashlight into the basement of the house, Deputy Emerson was able to identify various landmarks. While doing so, he saw Mr. Buchanan coming down the stairs into the cellar and he observed blood on Mr. Buchanan's knuckles as he descended. Deputies Hatch and Emerson were standing near each other outside the basement door. Mr. Buchanan unexpect-

edly opened the door, spit at Deputy Emerson, screamed at them to get off his property, turned, and began to head back up the basement stairs. As Mr. Buchanan turned to close the door, Deputy Emerson tried to grab him, but missed. Neither Deputy informed Mr. Buchanan he was under arrest or ordered him to submit to their authority.

#### 5. The Deputies Enter.

Deputy Emerson said, "I'm going to grab him." He entered the house after Mr. Buchanan, with Deputy Hatch following. When Mr. Buchanan got to the top of the basement stairs, he entered the living area and shut the door. Deputies Emerson and Hatch proceeded up the basement stairs toward the living area.

#### 6. Mr. Buchanan is Shot.

Deputy Emerson arrived at a landing at the top of the basement stairs with Deputy Hatch behind him about one-third of the way up the stairs. Mr. Buchanan reappeared with a kitchen knife in hand and began to stab Deputy Emerson. Deputy Emerson cried out: "He's killing me, he's killing me." Deputy Hatch shot and killed Mr. Buchanan, who fell from the landing onto a wood pile and dirt floor below.

### II. THE LAWSUIT

#### A. The Parties.

On February 25, 2004, Daniel Buchanan, acting as personal representative of the estate of his brother, Michael Buchanan, filed suit against the State of Maine and Lincoln County. In addition to the State and County, the complaint lists certain individual Defendants (the State Defendants): Lynn Duby, individually and in her official capacity; John Nicholas, in his official capacity only; Julianne Edmonson, in her individual capacity only; and, Joel Gilbert, in his individual capacity only. It

also lists certain other individuals (the County Defendants): William Carter, former Lincoln County Sheriff, in his individual capacity only; Todd Brackett, current Lincoln County Sheriff, in his official capacity only; Robert Emerson, in his individual capacity only; and Kenneth Hatch, in his individual capacity only.

## B. The Causes of Action.

Counts I through VI of the First Amended Complaint are § 1983 claims, asserting various constitutional violations. Count VII, as amended, alleges a Title II ADA reasonable accommodation violation. Counts VIII and IX are state tort claims and Count X is a punitive damages count.

## III. THE RECOMMENDED DECISIONS ON THE MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT AND ORDERS ON MOTION FOR LEAVE TO AMEND

Shortly after being served, the County and State Defendants filed motions to test the legal sufficiency of the Complaint. On November 2, 2004 and November 9, 2004, the United States Magistrate Judge issued Recommended Decisions and Orders on the State and County motions respectively. Mr. Buchanan has limited his objection to her recommendation to grant the dismissal of newly amended Count VII—the ADA Count—as futile and to her Order to deny the Motion for Leave to File Amended Complaint on the same basis. The State Defendants' sole objection is to the Magistrate Judge's recommendation that the § 1983 Counts against Julianne Edmonson and Joel Gilbert state a viable equal protection claim. If the § 1983 claims were dismissed, the State Defendants suggest this Court would be without jurisdiction over the remaining state claims. The County Defendants did not object to the Recommended Decision.

## IV. DISCUSSION

### A. Count VII: ADA Claim for Failure to Accommodate.

#### 1. The Recommended Decision.

As originally cast, Plaintiff's Count VII stated a claim under Title III of the ADA, the Title that forbids discrimination in public accommodations. After the Defendants' motions were filed, Mr. Buchanan, realizing he had erred in citing Title III, moved to amend Count VII to allege a claim under Title II, 42 U.S.C. § 12132, which addresses discrimination by public entitles on the basis of disability. Count VII in the First Amended Complaint, however, invited further confusion. First, it was still headed, 42 U.S.C. § 12182(a) Public Accommodation Discrimination, still citing to the general prohibition section of Title III. Also, the Amended Complaint retained some public accommodation language, leading to the impression that newly revised Count VII was garbled, attempting to allege an odd and unsustainable amalgam of Titles II and III.

In her Recommended Decision, the Magistrate Judge addressed the futility objections to the Motion for Leave to Amend Count VII. She understandably treated new Count VII as stating a more traditional disparate impact claim of Title II discrimination, namely that the State or County had discriminated against Mr. Buchanan by reason of his disability by denying him benefits. *Rec. Dec.* at 6 (Docket # 43) (citing *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir.2000)). Applying *Doe v. Pfrommer*, 148 F.3d 73 (2d Cir.1998), she concluded Count VII did not state a disparate impact claim, because Mr. Buchanan had not been denied because of his disability a public service

available to certain "able" members of the population. *Rec. Dec.* at 9. The State and County cannot discriminate "against mental health patients in the provision of mental health services that they provide *only* to mental health patients." *Id.* at 6. She, therefore, denied the Motion to Amend, because it would be futile. This Court agrees with the Magistrate Judge on the *Pfrommer* analysis.

## 2. Count VII: A Title II Claim for Reasonable Accommodation.

Upon objection, however, it has become clear Mr. Buchanan was not seeking to amend the Complaint to allege a traditional disparate treatment Title II claim. He was instead attempting to state a reasonable accommodation claim under Title II. Drawing authority from *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), Mr. Buchanan asserts that to state a Title II reasonable accommodation cause of action, he does not need to produce evidence of a "comparison class, *i.e.,* no similarly situated individuals given preferential treatment." *Olmstead,* 527 U.S. at 598, 119 S.Ct. 2176. In *Olmstead,* the United States Supreme Court addressed a claim under Title II of the ADA from mentally disabled individuals who challenged their continued institutionalization, instead of community based mental health care. Rejecting the "comparison class" argument, *Olmstead* concluded that "Congress had a more comprehensive view of the concept of discrimination advanced in the ADA." *Id.*

In further support, Mr. Buchanan cites *Henrietta D. v. Bloomberg,* 331 F.3d 261 (2d Cir.2003), *cert. denied,* 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004), another Second Circuit case. In *Henrietta D.,* the plaintiffs were indigent New York City residents who suffered from AIDS and other HIV-related illnesses. They claimed New York State and New York City had failed to provide them with adequate access to public benefits and thereby violated various federal and state statutes, including Title II of the ADA. The government defendants in *Henrietta D.* raised the same argument the Defendants raise here: "The defendants argue that because the plaintiffs have not demonstrated that they are receiving less access than persons without disabilities to the services they seek, they have failed to show that they are 'denied the benefits of the services .... of a public entity ... *by reason of their disability.*'" *Henrietta D.,* 331 F.3d at 272 (citing 42 U.S.C. § 12132) (emphasis in original). *Henrietta D.* concluded a Title II plaintiff who wishes to proceed on a reasonable accommodation theory is not required to establish disparate impact. *Id.* at 273. In doing so, *Henrietta D.* stated it was following other circuits and "the suggestions of the *Olmstead* plurality." *Id.*

One circuit *Henrietta D.* cited was the First Circuit. In *Bailey v. Georgia–Pacific Corp.,* 306 F.3d 1162 (1st Cir.2002), the First Circuit described Title I of the ADA: "In addition to forbidding disparate treatment of those with disabilities, the ADA makes it unlawful for an employer to fail to provide reasonable accommodations for the known physical or mental limitations of otherwise qualified individuals with disabilities ...." *Bailey,* 306 F.3d at 1166; *Garcia–Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 646 n. 9 (1st Cir.2000) ("The ADA does more than prohibit disparate treatment. It also imposes an affirmative obligation to provide reasonable accommodation to disabled employees."); *see also McGary v. City of Portland,* 386 F.3d 1259, 1265–66 (9th Cir.2004); *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79 (2d Cir.2004); *Bird v. Lewis & Clark College,* 303 F.3d 1015, 1020 (9th Cir.2002), *cert. denied,* 538 U.S. 923, 123 S.Ct. 1583, 155 L.Ed.2d 314 (2003); *Bultemeyer v. Fort*

*Wayne Cmty. Schs.*, 100 F.3d 1281, 1283 (7th Cir.1996); *Dunlap v. Ass. of Bay Area Gov'ts*, 996 F.Supp. 962, 965 (N.D.Cal.1998) ( ... (T)he ADA not only protects against disparate treatment, it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.').

 To establish a violation under the ADA, Mr. Buchanan must demonstrate that: 1) he is a "qualified individual" with a disability; 2) the defendants are subject to the ADA; and, 3) he was denied the opportunity to participate in or benefit from the defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of his disabilities. *Henrietta D.*, 331 F.3d at 272. The inquiry is "not whether the benefits to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." *Id.* at 273. *See Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Based on *Olmstead* and its progeny, including *Bailey* and *Garcia–Ayala*, this Court concludes Mr. Buchanan has set forth in amended Count VII a viable reasonable accommodation theory under Title II of the ADA and, therefore, rejects the Magistrate Judge's recommendation that Count VII be dismissed.[4]

**3. Motion for Leave to Amend Complaint.**

In view of this Court's determination that Count VII, as set forth in the First Amended Complaint, states a viable cause of action, this Court concludes the Magistrate Judge's denial of the Motion to Amend is contrary to law and grants Mr. Buchanan's Motion for Leave to Amend Complaint.

**B. The State Defendants' Objection: The Equal Protection Issue.**

The State Defendants objected to the Magistrate Judge's Recommended Decision regarding the equal protection claims in Counts II and III under 42 U.S.C. § 1983 on the ground that there are no allegations Ms. Edmonson and Mr. Gilbert "treated Mr. Buchanan differently than any other similarly situated person."[5] *Obj. of the State Defs.'s* at 5–6 (Docket # 45). They assert to state an equal protection claim there must be an allegation of differential treatment. *Id.* at 6. This Court affirms the decision of the Magistrate Judge on the equal protection theory underlying Counts II and III for the reasons set forth in her Recommended Decision.

**V. CONCLUSION**

1. To the extent the Plaintiff and the State Defendants did not object to the Magistrate Judge's Recommended Deci-

**4.** The Court recognizes the Title II claim against Lincoln County is more attenuated, but concludes it survives dismissal.

**5.** The Magistrate Judge recommended dismissal of the equal protection § 1983 claim against the County Defendants. Mr. Buchanan did not object to that part of the Recommended Decision. In addition, the State Defendants argued that, if the equal protection claim were dismissed, there would be no pending federal cause of action against them

and the case should be dismissed. With this Court's decision on Count VII however, there is a separate basis for federal jurisdiction. Mr. Buchanan did not object to the portions of the Magistrate Judge's Recommended Decision that recommended dismissal of the other bases for the § 1983 claims in Counts I, II, and III or the dismissal of Count I against the Commissioners on all bases, including equal protection.

sion filed November 2, 2004 (Docket # 43), the Recommended Decision is accepted:

A. Count I of Plaintiff's First Amended Complaint is DISMISSED;

B. Counts II and III of Plaintiff's First Amended Complaint are DISMISSED, except to the extent they allege equal protection violations against Defendants Gilbert and Edmonson; and,

C. The Motion to Dismiss the state law claims is DENIED.

2. To the extent the Plaintiff and the County Defendants did not object to the Magistrate Judge's Recommended Decision dated November 9, 2004 (Docket # 44), the Recommended Decision is accepted:

A. Summary judgment is GRANTED on Counts VIII, Count IX, and Count X to the extent these counts are lodged against Lincoln County and against Sheriff Brackett in his official capacity; and,

B. Counts IV, V, and VI of Plaintiff's First Amended Complaint are DISMISSED, except to the extent they allege a Fourth Amendment excessive force violation.

3. Regarding the Plaintiff's objection to the portion of the Recommended Decisions that concluded Count VII as set forth in the First Amended Complaint failed to state a claim upon which relief could be granted, it is ORDERED that that portion of the Recommended Decisions is REJECTED. The Defendants' Motions to Dismiss Count VII as set forth in the First Amended Complaint for failure to state a claim are DENIED.

4. The Magistrate Judge's denial of the Plaintiff's Motion for Leave to Amend Complaint is reversed as contrary to law and the Motion for Leave to Amend is GRANTED.

SO ORDERED.